610 So.2d 746 (1992)
STATE of Louisiana
v.
Michael Owen PERRY.
No. 91-KP-1324.
Supreme Court of Louisiana.
October 19, 1992.
Dissenting Opinion November 9, 1992.
Rehearing Denied November 25, 1992.
*747 Keith B. Nordyke, June E. Denlinger, McGlinchey, Stafford, Cellini & Lang, Joseph I. Giarrusso, Jr., for applicant.
Richard Ieyoub, Atty. Gen., Douglas P. Moreau, Dist. Atty., Mary P. Jones, Kathleen E. Petersen, for respondent.
Dissenting Opinion by Justice Cole November 9, 1992.
DENNIS, Justice.
The fundamental question raised by this case is whether the state can circumvent the centuries old prohibition against execution of the insane by medicating an incompetent death row prisoner against his will with antipsychotic drugs and carrying out his death sentence while he is under the influence of the drugs. After a hearing to determine whether the death row inmate was competent to be executed, the trial court, in effect, found that the inmate was insane but susceptible to being made able to understand the link between his crime and punishment by antipsychotic drugs. The trial court ordered the state to administer antipsychotic drugs to the prisoner for this purpose, without his consent if necessary. The prisoner did not consent to medication, but applied for review by this court, which denied writs, 543 So.2d 487 (La. 1989), and by the United States Supreme Court, which granted certiorari. Perry v. Louisiana, 494 U.S. 1015, 110 S.Ct. 1317, 108 L.Ed.2d 492 (1990). After entertaining briefs and oral argument, the Supreme Court vacated the trial court's order and remanded the case for further proceedings in light of Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). Perry v. Louisiana, 498 U.S. 38, 111 S.Ct. 449, 112 L.Ed.2d 338 (1990). On remand, the trial court reinstated its order. We granted the prisoner's application for a writ of certiorari and stayed the trial court's forcible medication order. State v. Perry, 584 So.2d 1145 (La.1991).
We affirm in part and reverse in part. The trial court's determination that Perry is not competent for execution without the administration of antipsychotic drugs is affirmed. The court's order requiring the state to medicate Perry with antipsychotic drugs without his consent is reversed. The execution of the death sentence is stayed. The state may apply to this court for a modification of the stay of execution of the death sentence if Perry achieves or regains his sanity independently of and without the influence of antipsychotic drugs.
For centuries no jurisdiction has approved the execution of the insane. The state's attempt to circumvent this well-settled prohibition by forcibly medicating an insane prisoner with antipsychotic drugs violates his rights under our state constitution. La. Const.1974 Art. I, §§ 5, 20. First, it violates his right to privacy or personhood. Such involuntary medication requires the unjustified invasion of his brain and body with discomforting, potentially dangerous and painful drugs, the seizure of control of his mind and thoughts, and the usurpation of his right to make decisions regarding his health or medical treatment. Furthermore, implementation of the state's plan to medicate forcibly and execute the insane prisoner would constitute cruel, excessive and unusual punishment. This particular application of the death penalty fails to measurably contribute to the social goals of capital punishment. Carrying out this punitive scheme would add severity and indignity to the prisoner's punishment beyond that required for the mere extinguishment of life. This *748 type of punitive treatment system is not accepted anywhere in contemporary society and is apt to be administered erroneously, arbitrarily or capriciously.

I. FACTS, PROCEDURAL HISTORY AND ISSUE
Michael Owen Perry was convicted and sentenced to death for murdering his mother, father, nephew and two cousins in a senseless criminal episode in 1983. Perry was 28 at the time of his offenses but had continued to live with his parents due to his long history of mental illness. At the age of 16, he was diagnosed as schizophrenic, and he was committed to mental institutions by his parents several times because of his psychotic symptoms. Although the record does not disclose any previous criminal conduct, he escaped from mental facilities twice and was made to sleep in a shed behind his parents' house due to his disruptive conduct.
Perry's mental illness raised legal issues throughout the criminal proceedings. Initially, two sanity commissions were convened to determine his competence to stand trial. State v. Perry, 502 So.2d 543, 547 (La.1986) cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987). Upon recommendation of the first commission, Perry was transferred to a state facility for treatment and psychiatric evaluation. Id. at 547-48. After being diagnosed as suffering from a long history of paranoid schizophrenia, Perry was placed on an antipsychotic drug treatment program, primarily consisting of doses of the drug Haldol. Eighteen months later, he was determined to be competent to stand trial, as recommended by the second sanity commission. Id. at 548. Following this, Perry was allowed by the court, contrary to advice of his counsel, to withdraw his insanity plea and proceed to trial on a simple plea of not guilty. Id. at 547, 550.
Perry was convicted of five counts of murder in 1985 and sentenced to death. On appeal this court affirmed his convictions and sentence, but stated that a determination of his competency to be executed "might be in order." State v. Perry, 502 So.2d 543, 564 (La.1987). Following the suggestion of this court, the trial court convened a sanity commission and conducted hearings. The medical experts reported that Perry suffers from an incurable schizoaffective disorder that causes his days to be a series of hallucinations, delusional and disordered thinking, incoherent speech, and manic behavior. These symptoms can be temporarily diminished with antipsychotic drugs, they testified, but his underlying insanity can never be permanently cured or quelled. After receiving this testimony, the court concluded that Perry was competent for execution only while he was being maintained by antipsychotic drugs in the form of Haldol. In effect, the trial court found that without the influence of antipsychotic drugs, Perry is insane and incompetent for execution. Accordingly, the court ordered the state to maintain Perry on this medication "as to be prescribed by the medical staff of said Department [of Corrections] and if necessary to administer said medication forcibly to defendant and over his objection."
After this court denied his writ and appeal, Perry sought and was granted a writ of certiorari by the United States Supreme Court. Perry v. Louisiana, 494 U.S. 1015, 110 S.Ct. 1317, 108 L.Ed.2d 492 (1990). After full briefing and oral argument, the high court vacated the trial court order and remanded the case to that court for reconsideration in light of Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). Perry v. Louisiana, 498 U.S. 38, 111 S.Ct. 449, 112 L.Ed.2d 338 (1990). After considering the Supreme Court's remand, and without taking any additional evidence, the trial court reinstated its forcible medication order. Essentially, the trial court concluded that Washington v. Harper is inapplicable to a proceeding to determine competence for execution and does not require a different result from the trial court's original determination. This court granted a writ to review the trial court's action and issued a stay order to prevent the forcible medication of the prisoner. State v. Perry, 584 So.2d 1145 (La.1991).
*749 This case hinges on whether the state constitutionally may forcibly medicate Perry and carry out his death sentence. There is no question but that Perry is incurably insane and incompetent for execution. Without the administration of antipsychotic drugs, Perry cannot pass any known test of competency. Nevertheless, when he is under the influence of antipsychotic drugs Perry sometimes is able to function at a minimum level of rationality. There is no contention by the state that Perry has consented to take the drugs. There is also no claim by Perry that the punishment would be unconstitutional if he were sane. The basic constitutional issue is, therefore, determinative and must be addressed.
The subsidiary issues raised are deferred because they will be rendered moot by our decision that the state's dual objective of forcible medication and execution is unconstitutional. The issues deferred include whether the trial court applied the appropriate standard for measuring competence for execution and whether the evidence in the present record is sufficient to support the trial court's finding that the inmate's mental competence can be maintained predictably and consistently with antipsychotic drugs. Moreover, our decision of these subsidiary issues in favor of Perry would not be dispositive of this case because the basic constitutional question would still control whether or not the state on remand would be permitted to medicate Perry and demonstrate while following correct legal precepts that he can be maintained forcibly with drugs at a consistent level of competence for execution.

II. PROHIBITION AGAINST EXECUTION OF THE INSANE
In Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) the United States Supreme Court held that the Eighth and Fourteenth Amendments prohibit a state from inflicting the death penalty upon a prisoner who is insane. The court recognized that the common law's ancient prohibition of execution of the insane rested on multiple theories including moral, ethical and theological arguments together with the negligible deterrent and retributive value of executing the insane. Some authorities contended that the bar was justified as a way of preserving the defendant's ability to make arguments on his own behalf. See 1 M. Hale, Pleas of the Crown, 35 (1736) ("if after judgment he became of non sane memory, his execution shall be spared; for were he of sound memory he might allege somewhat in stay of judgement or execution"). Accord 4 W. Blackstone, Commentaries 388-89; 477 U.S. at 407-09, 106 S.Ct. at 2600-02. Other authorities agreed with Sir Edward Coke, who argued that because execution was intended to be an "example" to the living, the execution of "a mad man" was such a miserable spectacle ... of extreme inhumanity and cruelty" that it "can be no example to others". See 3 E. Coke, Institute 6 (1794).
Additional commentators postulated religious underpinnings: that it is uncharitable to dispatch an offender "into another world, when he is not of a capacity to fit himself for it," Hales, Remarks on the Trial of M. Charles Basement, 11 HOW.St.T. 474, 477 (1685). It is also said that execution serves no purpose in these cases because madness is its own punishment. Blackstone, supra, at 395. More recent authorities declare that the community's quest for "retribution"the need to offset a criminal act by punishment of an equivalent "moral quality"is not served by executing an insane person, which has a "lesser value" than that of the crime for which he is to be punished. See Hazard & Louisell, Death, the State and the Insane: Stay of Execution, 9 UCLA 381, 387 (1962). Faced with such a solid and widespread proscription, the Supreme Court concluded that, whether its aim is to protect the condemned from fear and pain without comfort of understanding, or to protect the dignity of society itself from the barbarity of exacting mindless vengeance, the prohibition against execution of the insane finds enforcement in the Eighth Amendment. 477 U.S. at 410, 106 S.Ct. at 2602.
Even before the Supreme Court constitutionalized the rule in Ford, no state in the *750 union permitted the execution of the insane. At the time of its decision, 26 of the 41 death penalty jurisdictions had adopted statutes explicitly requiring the suspension of the execution of a prisoner who meets the legal test for incompetence. 477 U.S. at 408, n. 2, 106 S.Ct. at 2601 n. 2. Others had enacted more discretionary statutory procedures for suspension of sentence and transfer to mental facilities in such cases. Id. Still others, including Louisiana, had adopted the common law rule by judicial decision. Id.
For nearly a century it has been well-settled in Louisiana that one who has been convicted of a capital crime and sentenced to suffer the penalty of death, and who thereafter becomes insane, cannot be put to death while in that condition. State v. Parker, 80 So.2d 863 (La.1955); State v. Allen, 204 La. 513, 15 So.2d 870 (1943); State v. Migues, 194 La. 1081, 195 So. 545 (1940); State v. Cannon, 185 La. 395, 169 So. 446 (1936); State v. Burnham, 162 La. 737, 111 So. 79 (1926); State v. Brodes, 157 La. 162, 102 So. 190 (1924); State ex rel. Paine v. Judge, 49 La.Ann. 1500, 22 So. 738 (1897).
In Art. I, § 20 of the Louisiana Constitution of 1974, the people provided that "[n]o law shall subject any person to euthanasia, to torture or to cruel, excessive, or unusual punishment." (emphasis added.) The framers of our state constitution clearly intended for this guarantee to go beyond the scope of the Eighth Amendment in some respects and to provide at least the same level of protection as the Bill of Rights and the Fourteenth Amendment in all others. State v. Sepulvado, 367 So.2d 762 (La.1979); Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 63 (1974). Consequently, the practice of executing the insane is thrice barred in our state, i.e., by the state and federal constitutions and by the decisions of this court.

III. DETERMINATION THAT STATE LAW IS APPLICABLE
The state's proposed medicate-to-execute scheme raises issues pertaining to fundamental guarantees under both the Louisiana and federal constitutions. Principles of jurisprudence, efficiency and federalism dictate that the appropriate procedure for deciding such a case is to analyze state law, including state constitutional provisions, before reaching a federal constitutional claim.
Both the United States Supreme Court and this court adhere to the rule that the court will not pass upon a federal constitutional question, although properly presented by the record, if there is also present some other ground upon which the case may be disposed. See Webster v. Reproductive Health Services, 492 U.S. 490, 526, 109 S.Ct. 3040, 3060, 106 L.Ed.2d 410 (1989) (O'Connor, J., concurring), collecting authorities; Ashwander v. TVA, 297 U.S. 288, 346-347, 56 S.Ct. 466, 482-83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); Benson & Gold Chevrolet Inc. v. La. Motor Veh. Com'n, 403 So.2d 13 (La.1981) and authorities cited therein. Additionally, the Supreme Court has developed the Pullman doctrine, under which a federal court may decline to proceed though it has jurisdiction based on the federal constitution or statutes, in order to avoid decision of a federal constitutional question where the case may be disposed on questions of state law. Texas v. Pullman, Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); See Wright, Law of Federal Courts, 302 et seq. (1983); see also La. Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); Leiter Minerals, Inc. v. U.S., 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957). Therefore, an improper by-pass of a state constitutional or legal question by this court may result in an unnecessary federal constitutional decision, a remand of the case by the Supreme Court, or both.
Greater judicial efficiency and coherence are promoted when we address state law issues first. See Large v. Superior Court, 148 Ariz. 229, 235, 714 P.2d 399, 405 (1986); City of Portland v. Jacobsky, 496 A.2d 646, 648 (Me.1985); State v. Chaisson, 125 N.H. 810, 486 A.2d 297, 301 (1984); Sterling v. Cupp, 290 Or. 611, 625 *751 P.2d 123, 126 (1983); State v. Coe, 101 Wash.2d 364, 679 P.2d 353, 359 (1984); Developments in the Law: The Interpretation of State Constitutional Rights, 95 Harv. L.Rev. 1324, 1448 (1982). See also Massachusetts v. Upton, 466 U.S. 727, 736, 104 S.Ct. 2085, 2089, 80 L.Ed.2d 721 (1984) (Stevens, J., concurring). Because this court is the final arbiter of the meaning of the state constitution and laws, our disposition of a case on state grounds usually will terminate the litigation without the necessity of federal review. Furthermore, because our state Declaration of Rights incorporates or expands most of the federal Bill of Rights standards, a decision by this court upholding an individual's state constitutional right rarely will call for further review by the Supreme Court. Because of our oaths to support the constitution and laws of our state as faithfully and diligently as those of the federal government, La. Const. Art. X, § 30 (1974), we are obliged to independently interpret and apply our state constitution in each case. As long as one party's state rights are expanded without infringement on another individual's federal right, our state constitution may be used to supplement or expand federally guaranteed constitutional rights. See Pruneyard Shopping Center v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); Linde, E. PluribusConstitutional Theory and State Courts, 18 Ga.L.Rev. 165, 179 (1984); Developments in the Law: The Interpretation of State Constitutional Rights, 95 Harv. L.Rev. 1324, 1334 (1982).
The very nature of our federal system and the vast differences between the federal and state constitutions and courts indicate that state law should be applied first. When the Founding Fathers assembled this nation, they recognized the primacy of the states in protecting individual rights. Mosk, State Constitutionalism: Both Liberal and Conservative, 63 Tex. L.Rev. 1081, 1083 (1985) citing The Federalist Nos. 14, 17, 32, 39, and 45. As Madison commented:
The powers delegated by the proposed Constitution to the Federal Government, are few and defined. Those which are to remain in the State governments are numerous and indefinite. The former will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce.... The powers reserved to the several States will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties and properties of the people; and the internal order, improvement, and prosperity of the State.
The Federalist No. 45, at 313 (J. Madison) (J.E. Cooke ed. 1961).
Although not entirely proper, a state court's failure to apply state law first might be understandable when well-settled, clearly applicable federal precedent is available. However, the Supreme Court's remand of this case without decision evidences the unavailability of readily applicable dispositive federal precepts. Therefore, we set to one side, without deciding, the federal constitutional issues and proceed to resolve this case on state constitutional grounds.

IV. WASHINGTON v. HARPER DISTINGUISHED
Before applying the controlling state constitutional law, however, we consider the present case in light of Washington v. Harper, a case involving the forcible medical treatment of a mentally ill prisoner in his own best medical interest and for the safety of himself and others in the prison. We conclude that the present case is distinguishable for several reasons. First, forcing a prisoner to take antipsychotic drugs to facilitate his execution does not constitute medical treatment but is antithetical to the basic principles of the healing arts. Second, Harper held that due process requires the state to show that its prison regulation rationally seeks to further both the best medical interest of the prisoner and the state's own interest in prison safety before it may inject a prisoner with antipsychotic drugs against his will. The state in Perry's case has made neither showing but seeks forcible medication of a prisoner by court order as an instrument of his execution. Third, Harper not only fails to support the state's position; it strongly *752 implies that forced administration of antipsychotic drugs may not be used by the state for the purpose of punishment.

A. Drugging For Execution:

Punishment, Not Medical Treatment
I swear by Apollo the physician, by Aesculapius, Hygeia, and Panacea, and I take to witness all the gods, all the goddesses, to keep according to my ability and my judgment the following Oath:... I will prescribe regimen for the good of my patients according to my ability and my judgment and never do harm to anyone. To please no one will I prescribe a deadly drug, nor give advice which may cause his death ... I will preserve the purity of my life and my art... In every house where I come I will enter only for the good of my patients, keeping myself far from all intentional ill-doing....
Hippocrates c. 460-400 B.C., Stedman's Medical Dictionary 647 (4th Unabridged Lawyer's Ed.1976).
Medical treatment does not consist merely of dispensing drugs; other ingredients are essential to the healing arts. The Hippocratic Oath, dating from the fifth century B.C., is the seminal source of the principles of medical ethics and the goals of medical treatment. Under the oath, the physician pledges to do no harm and to act only in the best medical interests of his patients. Consequently, medical treatment cannot occur when the state orders a physician to administer antipsychotic drugs to an insane prisoner in an attempt to render him competent for execution.
Because the physician is required by his oath both to alleviate suffering and to do no harm, the state's order forces him to act unethically and contrary to the goals of medical treatment. If any physician administers drugs forcibly and thereby enables the state to have the inmate declared competent for execution, the doctor knowingly handles the prisoner harmfully and contrary to his ultimate medical interest. The physician's abstention from dispensing the drugs, however, perpetuates suffering that ordinarily the physician is duty-bound to allay by treatment. If the drugs are forcibly administered by a person who is not a physician, what occurs is devoid of any pretense of medical treatment or compliance with the principles of medical ethics. Accord: Katz, Perry v. Louisiana: Medical Ethics on Death RowIs Judicial Intervention Warranted?, 4 Geo.J.Leg.Ethics 707 (1991); Radelet & Barnard, Treating Those Found Incompetent for Execution: Ethical Chaos with Only One Solution, 16 Bull.Am.Acad.Psychiatry L. 297 (1988); Salguero, Medical Ethics and Competency to be Executed, 96 Yale L.J. 167 (1986); Evans, Perry v. Louisiana: Can a State Treat an Incompetent Prisoner to Ready Him for Execution?, 19 Bull.Am.Acad.Psychiatry L. 249 (1991); Ewing, Diagnosing and Treating Insanity on Death Row: Legal and Ethical Perspectives, 5 Behavioral Sciences and the Law 175 (1987). Therefore, the forcible medication of a prisoner merely to improve his mental comprehension as a means of rendering him competent for execution actually prevents the prisoner from receiving adequate medical treatment for his mental illness.
Several pernicious effects are caused by the forcible medicate-to-execute structure. First, the patient's autonomy rights are violated because he is not permitted to weigh the benefits and risks of a proposed course of treatment in consultation with his physician as is required in seeking the patient's best medical interest. See generally, E. Pellegrino & D. Thomasma, For the Patient's Good 37-50 (1988). Second, the forcible nature and lethal repercussions of the state's involuntary antipsychotic drug regimen preclude a trustful, communicative doctor-patient relationship that is essential to psychiatric therapy. Katz, supra, at 718. Third, since the physician cannot serve two masters, there is a substantial concern that the patient's well-being may be subordinated to the duty the doctor owes the state. Evans, supra, at 261; Salguero, supra, at 176. Fourth, for all of the foregoing reasons, and because of the incompatibility of the interests of the state and the prisoner, both of which the physician is required to further, the death penalty *753 is apt to be implemented arbitrarily and capriciously. The aggregate of conditions surrounding the physician's determination of the prisoner's mental capacity at the time of execution does not yield room for well-informed and dispassionate medical judgment. Consequently, there is no genuine assurance that the "barbarity of exacting mindless vengeance" abhorred for centuries by all civilized societies will not occur under a modern scientific facade. Fifth, a psychiatrist's administration of involuntary medication may constitute being "a participant in a legally authorized execution" contrary to the ethical code of the American Medical Association, as adopted and interpreted by the American Psychiatric Association. APA, The Principles of Medical Ethics: With Annotations Especially Applicable to Psychiatry § 1, Annot. 4 (1989). Notably, the psychiatrist's involvement in the restoration of competence through forcible drug treatment raises further ethical concerns because it is more closely tied to the execution itself in comparison with other functions performed by psychiatrists in death penalty cases, e.g., determinations of competence for trial. By the same token, the physician's forcibly drugging an inmate for execution comes closer to being the cause of death in furthering the state's punishment goal than to the practice of medicine or treatment in the patient's best interest. See Katz, supra, at 715; Salguero, supra, at 176-77. Sixth, blurring the distinction between healing and punishing denigrates the "deep-seated social interest in preserving medical care, in actuality and in perception, as an unambiguously beneficent healing art." Katz, supra, at 724.
Accordingly, we conclude that a physician's prescription and administration of antipsychotic drugs to a prisoner against his will, pursuant to the order of a state court or other government official, for the purpose of carrying out the death penalty, does not constitute medical treatment but forms part of the capital punishment sought to be executed by the state. As Professor Opton succinctly put it:
"[T]he difference between a violent punishment and a medical treatment lies not in the act itself, but in the intent of the actor. When a medical procedure is done at the request of the patient and for his benefit, it is a treatment. When the identical medical procedure is done against a person's interest or will, it is either a battery, if lacking legal sanction, or a punishment, if imposed by legal authority."
Opton, Psychiatric Violence Against Prisoners: When Therapy Is Punishment, 45 Miss.L.J. 605, 608 (1974).

B. Harper Does Not Authorize Medication For Punishment
In Washington v. Harper, the Supreme Court considered a state prisoner's substantive and procedural due process challenges to the State of Washington's prison regulation governing the forced medical treatment of inmates with antipsychotic drugs. Under the contested regulation, such medical treatment could be forced on a prisoner only when it was in his best medical interest and in the interest of his or others' safety in the prison. The regulation further provided that antipsychotic medication could be administered for no purpose other than medical treatment and then only under the direction of a licensed psychiatrist. Washington v. Harper, supra, 494 U.S. at 201 n. 8, 110 S.Ct. at 1024 n. 8.
The Supreme Court held that the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty, but that, taking into account the state's unique interest in prison safety and security, substantive due process allows a mentally ill inmate to be treated involuntarily with antipsychotic drugs where there is a determination that "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Riggins v. Nevada, ___ U.S. ___, 112 S.Ct. 1810, 1815, 118 L.Ed.2d 479 (1992), quoting and interpreting Washington v. Harper, supra, 494 U.S. at 227, 110 S.Ct. at 1039. Therefore, under Harper, "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification *754 and a determination of medical appropriateness." Id.
The Supreme Court's holding in Washington v. Harper is inherently inapposite to the present case. The state's object here is to forcibly administer antipsychotic drugs to a prisoner in order to implement his execution. In contrast, the state's object in Harper was to require a prisoner to accept appropriate medical treatment that was in his own best medical interest. Therefore, in the present case, the state's involuntary use of drugs on Perry must be vindicated if at all as a procedure that legitimately forms part of his capital punishment. It cannot be justified under Harper because forcible administration of drugs to implement execution is not medically appropriate.
But even if we overlook the incongruity of applying a medical treatment precedent in a capital punishment context, Harper still cannot be applied to yield the result desired by the state. In Harper, the Supreme Court developed a substantive due process standard that requires the state to show that the prisoner is dangerous to himself or others and that the antipsychotic drug medical treatment is appropriate medically and in his best medical interest. The state's proof in the present case simply does not measure up to this due process standard. This, of course, is not surprising because the Harper standard has nothing to do with the issues with which the trial court and the parties dealt with below, viz., whether Perry was competent for execution and whether he could be consistently maintained with drugs at a level of competency and executed in that condition.
The present case, in which the state is represented by the prosecutorial arm of government, began as a proceeding to determine whether Perry was mentally competent to proceed with his execution and ended with a court determination that his competence could be maintained only by medication and an order authorizing and directing the state to forcibly medicate him for that purpose. In contrast, Harper was a proceeding initiated by medical doctors pursuant to a regulation carefully drawn by prison administrators governing forcible medical treatment of prisoners in the interest of their medical welfare and prison safety and security. The regulation forbade the use of antipsychotic drugs for any purpose other than by a psychiatrist for medical treatment. In the present case, the parties and the trial court directed the expert medical witnesses' attention and testimony to the subjects of whether Perry was sane without drugs and whether his ability to understand his punishment and its connection with his crimes could be maintained predictably and consistently with antipsychotic medicine. It is obvious that none of the participants considered that prison safety or the long term best medical interests of Perry were significant or determinative issues in the proceeding. Having conducted this proceeding with the single-minded purpose of forcibly medicating Perry in order to execute him, even in the United States Supreme Court, the state cannot now contend that it genuinely seeks to uphold the trial court's forced medication order merely to further Perry's best medical interest and the safety of Perry and others in the prison setting.
Furthermore, the majority opinion in Harper suggests that the substantive protections of the Due Process Clause prohibit the forced administration of antipsychotic drugs to any state prisoner whose best medical interest would not be advanced thereby. As Justice Stevens observed, the Court did not suggest that psychotropic drugs, any more than transfer for medical treatment, see Vitek v. Jones, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), may be forced on prisoners as a necessary condition of their incarceration or as a disciplinary measure. Washington v. Harper, supra, 494 U.S. at 241-42, 110 S.Ct. at 1047-48 (Stevens, J., concurring and dissenting in part). The majority repeatedly noted and seemed to consider it crucial to its due process standard that the Washington prison policy required that the drugs "may be administered for no purpose other than treatment" and that "the treatment in question will be ordered only if it is in the prisoner's medical interests, given the legitimate needs of his institutional confinement." *755 Id. at 227, 110 S.Ct. at 1039. From this Justice Stevens concluded that "[f]orced administration of antipsychotic medication may not be used as a form of punishment." Id. at 241, 110 S.Ct. at 1047. This inference seems to have been confirmed by the court's subsequent conclusion in Riggins v. Nevada, ___ U.S. ___ ___, 112 S.Ct. 1810, 1815, 118 L.Ed.2d 479 (1992) that "[u]nder Harper, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness."
Consequently, we conclude that Washington v. Harper, which is inherently inapposite and should not be applied to the present case, also sets forth a due process standard that the state has failed to meet, and strongly implies that antipsychotic drugs absolutely may not be used as a tool for punishment. For the reasons stated in the previous section of this opinion, however, we rest our decision not on inferences drawn from Harper, but on the state constitutional rights of privacy or personhood and humane treatment.

V. PRIVACY OR PERSONHOOD
The state's plan to force an insane prisoner to take antipsychotic drugs against his will as a necessary and integral antecedent to his execution infringes on several related interests protected by the right of privacy and personhood guaranteed by Art. I, § 5 of the 1974 Louisiana Constitution: the right to decide what is to be done medically with one's brain and body; the right to control one's own mind and thoughts; and the freedom from unwarranted physical interference with one's person. There is no compelling state interest that would be furthered measurably by the state's medicate-to-execute scheme. Therefore, the execution plan is unconstitutional and must be set aside.
The decisions of this court indicate that the Declaration of Rights (Article I) of the 1974 Louisiana Constitution embody and often amplify the protection of certain individual rights afforded by the pre-existing United States Supreme Court interpretations of the Fourteenth Amendment and Bill of Rights. We have, for instance, held that the Louisiana Constitution provides greater protection of individual rights than does the federal constitution with respect to state rights phrased identically to federal counterparts, State v. Church, 538 So.2d 993 (La.1989); State v. Hernandez, 410 So.2d 1381 (La.1982), State v. Breaux, 329 So.2d 696 (La.1976); state rights phrased more specifically or broadly than the corresponding federal rights, e.g., Sibley v. Board of Sup'rs of La. State Univ., 477 So.2d 1094 (La.1985), State v. Sepulvado, 367 So.2d 762 (La.1979); and state rights that have no explicit federal analog, e.g., State v. Spooner, 520 So.2d 336 (La.1988); Title Research Corp. v. Rausch, 450 So.2d 933 (La.1984). See Devlin, Privacy and Abortion Rights Under the Louisiana State Constitution: Could Roe v. Wade be Alive and Well in the Bayou State? 51 La.L.Rev. 685, 688-689 (1991); Comment, The Declaration of Rights of the Louisiana Constitution of 1974: The Louisiana Supreme Court and Civil Liberties, 51 La.L.Rev. 787 (1991) (authored by Richard Bullock). The consensus of the justices of this court has been that "our state constitution's declaration of individual rights ... represent[s] more specific ... [and] broader protection of the individual," Guidry v. Roberts, 335 So.2d 438, 448 (1976) (Tate, J.); and is "far broader and more definitely articulated than corresponding rights in the Federal Constitution." Id. 452, citing examples (Summers, J., dissenting). Moreover, there does not appear to have been a single instance in which this court has held that the Declaration of Rights affords less protection of individual liberties than did the Bill of Rights or other provisions of the federal constitution under the pre-existing Supreme Court interpretations.

A. Protected Privacy or Personhood Interests
Article I, § 5 of the 1974 Louisiana Constitution expressly guarantees that every individual shall be secure in his "person" against "unreasonable searches, seizures, or invasions of privacy." Since 1974, this *756 court and our courts of appeal have interpreted the right to privacy declared in Article I, § 5 to incorporate protection for several different categories of privacy interests. In the area of invasion of privacy by unreasonable searches or seizures, this court has interpreted the right of privacy to afford even more stringent protection of individual liberty than the Fourth Amendment. State v. Church, 538 So.2d 993 (La. 1989); State v. Hernandez, 410 So.2d 1381 (La.1982); State v. Kinnemann, 337 So.2d 441 (La.1976). One Louisiana court of appeal has held that the "privacy" guarantee affords protection against the unreasonable compilation or disclosure of information about individuals. Trahan v. Larivee, 365 So.2d 294 (La.App. 3rd Cir.1978). See Devlin, supra, at 691-92; Hargrave, supra, at 21; Note, Toward a Right of Privacy as a Matter of State Constitutional Law, 5 Fla.St.U.L.Rev. 632 (1977).
In Hondroulis v. Schuhmacher, 553 So.2d 398, 410 (La.1989) this court held that Art. I, § 5 also establishes an affirmative right to privacy that impacts more than criminal search and seizure law, incorporates the principles of the United States Supreme Court privacy decisions in explicit statement, and includes the recognition of a patient's right to decide whether to obtain or reject medical treatment and what shall or shall not be done with his body. Relying principally on Carey v. Population Services International, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) as containing a succinct statement of the privacy principles developed prior to the adoption of our state constitution we concluded: Although the federal constitution does not explicitly mention any right of privacy, the Supreme Court has recognized that one aspect of "liberty" protected by the Due Process Clause of the Fourteenth Amendment is a right of personal privacy or a guarantee of certain areas or zones of privacy. This right of personal privacy includes the interest in independence in making certain kinds of important decisions. While the outer limits of this aspect of privacy have not been marked by the Court, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage, procreation, contraception, family relationships, and child rearing and education. Hondroulis v. Schuhmacher, supra, at 414 (quoting and citing authorities).
In concluding that the decision to obtain or reject medical treatment should be recognized as falling within this cluster of constitutionally protected rights, this court noted that one federal court and numerous states had held that the right to privacy is broad enough to grant an individual the right to chart his or her own medical treatment plan. Id. citing Rasmussen by Mitchell v. Fleming, 154 Ariz. 207, 741 P.2d 674 (1987); Bouvia v. Superior Court, 179 Cal.App.3d 1127, 225 Cal.Rptr. 297 (1986); Foody v. Manchester Memorial Hospital, 40 Conn.Supp. 127, 482 A.2d 713 (1984); Severns v. Wilmington Medical Center, Inc., 421 A.2d 1334 (Del.1980); Satz v. Perlmutter, 362 So.2d 160 (Fla. App. 4th Dist.1978); Brophy v. New England Sinai Hospital, Inc., 398 Mass. 417, 497 N.E.2d 626 (1986); Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417 (1977); In Matter of Farrell, 212 N.J.Super. 294, 514 A.2d 1342 (1986); Matter of Quinlan, 70 N.J. 10, 355 A.2d 647 (1976), cert. denied sub nom. Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); Leach v. Akron General Medical Center, 68 Ohio Misc. 1, 426 N.E.2d 809 (1980); Matter of Welfare of Colyer, 99 Wash.2d 114, 660 P.2d 738 (1983); Andrews v. Ballard, 498 F.Supp. 1038 (S.D.Texas 1980). Cf. In re P.V.W., 424 So.2d 1015 (La.1982).
Moreover, we concluded that the choice of whether to undergo surgery or other medical treatment is to an extraordinary degree an intrinsically personal decision. The patient alone must live with his disorder, encounter the risks of therapy, or reap the consequences of treatment. By the same token, the choice will profoundly affect his or her development or life. It may mean the difference between life and death, pain and pleasure, poverty and economic stability. 553 So.2d at 414-415, citing Rasmussen by Mitchell v. Fleming, *757 supra; Andrews v. Ballard, supra. Accordingly, this court concluded that the Louisiana Constitution's right to privacy also provides for a right to decide whether to obtain or reject medical treatment. 553 So.2d at 415.
We have no doubt that this and other interests that Perry has in avoiding the forcible administration of antipsychotic drugs are protected by Art. I, § 5 despite his status as a prisoner. It is generally accepted that conviction of a crime and incarceration, while limiting an inmate's right to freedom from confinement, do not extinguish his right to liberty altogether. Vitek v. Jones, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Subject to the legitimate requirements of prison discipline and security, prison inmates retain their fundamental constitutional rights and protections. Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); Brown v. State, 117 Ariz. 476, 573 P.2d 876 (1978); Moen v. Wilson, 189 Colo. 85, 536 P.2d 1129 (1975); Roque v. Warden, 181 Conn. 85, 434 A.2d 348 (1980); State v. Holmes, 109 N.J.Super. 180, 262 A.2d 725 (1970); Bush v. Canary, 286 N.W.2d 536 (S.D. 1979); Matter of Sinka, 92 Wash.2d 555, 599 P.2d 1275 (1979).
In the evolution of the state constitution's Declaration of the Right of Due Process of Law, Art. I, § 2, the scope and nature of due process were understood not solely in terms of state jurisprudence under the prior due process clause, but also in light of the much broader contemporary federal due process developments. Also sought to be continued was the "fundamental fairness" analysis by which due process grows organically. Hargrave, supra, at 4. In view of this safeguard and the expanded protections of privacy and personhood afforded by Art. I, § 5, we conclude that the generally accepted principles regarding prisoners' retention of fundamental rights despite incarceration have been adopted by our state constitution.
Accordingly, because the involuntary medication was ordered as an integral and essential part of Perry's punishment and not because of any legitimate requirement of prison security or medical interest of Perry, we conclude that the medicate-to-execute scheme infringes on Perry's constitutionally protected interest in deciding whether to obtain or reject medical treatment and what shall be done medically with his mind and body.
It is a matter of first impression whether Art. I, § 5 also affords protection against the government's unjustified physical invasion of a person's body and brain or the government's control by any means of a person's mind and thoughts. However, the United States Supreme Court recognized that these types of interests were protected under the Bill of Rights and the Fourteenth Amendment well before the adoption of our state constitution. See Henkin, Privacy and Autonomy, 47 Colum.L.Rev. 1410 (1974).
The concept of constitutional privacy as protecting an individual in the security of his or her body was first articulated long ago. In U. Pacific R. Co. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891), the Court held that civil litigants could not be forced to submit to a surgical examination because "no right is held more sacred, or is more carefully guarded at common law, than the right of every individual to the possession and control of his own person... `to be let alone.'" Id. at 251, 11 S.Ct. at 1001. See also Olmstead v. U.S., 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). Governmental invasion of the body by stomach pumping "shocks the conscience" and was held to be a flagrant violation of substantive due process in Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Certain other governmental invasions have been treated as intrusions of a protected interest of privacy or personhood, although they eventually were upheld on a showing of clear necessity, procedural regularity, and lack of risk, trauma or pain to the individual. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (blood tests); Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (compulsory vaccinations); see L. Tribe, American Constitutional *758 Law, § 15-9, 1331-32 (2d ed. 1988). Indeed, "[c]ontrol over the body is the first form of autonomy and ... [a]ny plausible definition of privacy, then, whatever the sources of its normative commitments, must take the body as its first and most basic reference...." Gerety, Redefining Privacy, 12 Harv.Civ.Rts.Civ.Lb.L.Rev. 233, 266 (1977).
An individual's constitutionally protected interest in his mind, thoughts and mental processes was also recognized by the Supreme Court prior to the adoption of our state constitution. The operations of the mind are absolutely beyond the power of government to control. See Stanley v. Georgia, 394 U.S. 557, 565-66, 89 S.Ct. 1243, 1248-49, 22 L.Ed.2d 542 (1969) (Government does not have "the power to control men's minds" or "the right to control the moral content of a person's thought." "[A]lso fundamental is the right to be free... from unwarranted governmental intrusions into one's privacy."); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 67, 93 S.Ct. 2628, 2640, 37 L.Ed.2d 446 (1973) ("The fantasies of a drug addict are his own and beyond the reach of government [unlike] regulation of drug sales...."); Tribe, supra, §§ 15-5 et seq. Although these cases involved governmental attempts to usurp mental control by non-physical means, the decisions necessarily prohibit mind or thought control by physical or chemical means authorized or directed by the state.
For all of these reasons, we conclude that the state's plan to medicate and execute Perry would violate his bodily integrity, chemically alter his mind and will, and usurp his fundamental right to make decisions regarding his health or medical treatment. Each of these interests is protected from unwarranted governmental intrusion by Art. I, § 5's right of privacy or personhood. Moreover, these invasions are particularly intrusive because the forcible administration of antipsychotic drugs creates a substantial risk of permanent injury and premature death.

B. Interference By Forcible Injection Of Antipsychotic Drugs
When antipsychotic drugs are forcibly administered to further the state's interest in carrying out capital punishment, and therefore not done in the prisoner's best medical interest, the intrusion represents an extremely severe interference with that person's liberty. The object of the intrusion is hostile in the utmost instead of beneficent, and the trustful, communicative doctor-patient relationship essential to the effective humane administration of antipsychotic drugs cannot exist. Under these circumstances, the nonconsenting recipient of antipsychotic drugs is much less likely to receive adequate protection from severely burdensome side effects.
As the Supreme Court has recognized, the forcible injection of antipsychotic drugs into a nonconsenting person's body, even when done in his medical interest with medical appropriateness, represents a particularly severe interference with that person's liberty. Riggins, supra, ___ U.S. at ___, 112 S.Ct. at 1814; Harper, supra, 494 U.S. at 229, 110 S.Ct. at 1040. The Supreme Court summarized some of the potential effects of antipsychotic drugs as follows:
The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes. While the therapeutic benefits of antipsychotic drugs are well-documented, it is also true that the drugs can have serious, even fatal side effects. One such side effect identified by the trial court is acute dystonia, a severe involuntary spasm of the upper body, tongue, throat, or eyes. The trial court found that it may be treated and reversed within a few minutes through use of the medication Cogentin. Other side effects include akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia, perhaps the most discussed side effect of antipsychotic drugs. Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is *759 characterized by involuntary, uncontrollable movements of various muscles, especially around the face.... [T]he proportion of patients treated with antipsychotic drugs who exhibit the symptoms of tardive dyskinesia ranges from 10% to 25%. According to the American Psychiatric Association, studies of the condition indicate that 60% of tardive dyskinesia is mild or minimal in effect, and about 10% may be characterized as severe.
Riggins, supra, ___ U.S. at ___, 112 S.Ct. at 1814 (quoting Washington v. Harper, supra, 494 U.S. at 229-30, 110 S.Ct. at 1040-41). Furthermore, even when antipsychotic drugs are administered purely as part of appropriate medical treatment, the drugs do not cure the mental disorder. Horton, Restoration of Competency For Execution: Furiosus Solo Furane Punitur, 44 Southwestern Law Journal 1191, 1204 (1990); Kenna, Current Status of Institutionalized Mental Health Patients' Right to Refuse Psychotropic Drugs, 6 J.Legal Med. 107, 110 (1985). They merely calm and mask the psychotic symptoms which usually return to debilitate the patient when medication is discontinued. Horton, Id.; Gutheil & Appelbaum, "Mind Control", "Synthetic Sanity", "Artificial Competence", and Genuine Confusion: Legally Relevant Effects of Antipsychotic Medication, 12 Hofstra L.Rev. 77, 99-101 (1983).
The interference by forcible injection of antipsychotic drugs is even more severe and dangerous when done for purposes of capital punishment. Therefore, further elaboration on the potential effects of the drugs is called for, including the description and detail of additional side effects not contained in the Supreme Court's summary.
Antipsychotic drugs regularly produce a variety of disorders in the control of posture, muscle tone and movement, presumably as a result of dysfunction of the extrapyramidal nervous system. R. Baldessarini, Chemotherapy in Psychiatry: Principles and Practice, 37 (1985). Accordingly, these side effects are often termed extrapyramidal syndrome or "EPS". The medical experts who examined Perry for the sanity hearing attested to these potential harms. The toxicity of antipsychotics on the central nervous system is manifested by several of these characteristic motor disorders. Another such disorder, akinesia, causes lethargy, drooling, rigidity of facial muscles, lessening of spontaneity, apathy, and a disinclination to initiate activity. Note, Antipsychotic Drugs and the Incompetent Defendant: A Perspective on the Treatment and Prosecution of Incompetent Defendants, 47 Wash. & Lee L.Rev. 1059, 1061 (1990). Other regularly occurring effects include feelings of heaviness, sluggishness, weakness, faintness, dry mouth, blurred vision, insomnia, anxiety, euphoria, agitation, drowsiness, depression, headache, confusion, vertigo, grand mal seizures, impaired liver function, hallucinations, jaundice, breast engorgement, impotence, constipation, diarrhea, nausea, vomiting, and anorexia. See, Physician's Desk Reference 1375 (42d ed. 1989) (hereinafter PDR); Baldessarini, supra, at 68-74.
Tardive Dyskinesia may develop even after relatively brief periods of treatment, even at low dosage levels. PDR at 1374. Tardive dyskinesia can in some cases seriously impair skills in self-care, feeding, and swallowing. There is no known treatment. The only way to effectively reduce the risk of tardive dyskinesia is to thoughtfully and conservatively use antipsychotic drugs and attempt to use alternative treatments. Baldessarini, supra, at 78. However, it is likely that such measures would be inconsistent with and impossible under a scheme of preparation for execution which considers only the remission of psychotic symptoms to a level at which the prisoner would be considered competent for execution. Also, recipients of antipsychotic medication run the danger of developing neuroleptic malignant syndrome, a potentially fatal condition manifested by hyperpyrexia, muscle rigidity, catatonia, and autonomic instability, including irregular pulse or blood pressure, tachycardia, and cardiac dysrhythmia. PDR at 1374.
Acute dystonia typically occurs early in treatment and usually with high-potency neuroleptics. Baldessarini, supra, at 69. This condition as a rule causes severe anxiety. *760 Id. It is manifested by sustained uncontrollable excessive movement of the muscles of the neck, jaw, and tongue, as well as the eyes and trunk. Other symptoms may include trismus (lockjaw), opisthotonos (a condition of tetanic spasm of the muscles of the back, causing the head and lower limbs to bend backward and the trunk to arch forward), or tonic oculogyric movements or deviations of the eyes ("oculogyric crisis"). Facial grimacing, perioral spasms, protrusions or torsion of the tongue, sweating, fever and dysphagia are common. Laryngeal or pharyngeal spasm with dyspnea or life-threatening respiratory distress may develop, and a few fatalities have occurred. Id. These reactions are more likely to occur in young adult male patients.
Because of the many potentially harmful effects of antipsychotic drugs, the state's use of them to infringe upon a person's mind, body and medical autonomy as an instrument of capital punishment is far more invasive than other governmental interferences which have been held to be violative of the right of privacy or its forerunner, the right of substantive due process of law. In Hondroulis v. Schuhmacher, supra, the state statute at issue, as interpreted by the lower courts, impermissibly interfered with a person's right to decide what is to be done with his body by creating legal obstructions to his access to medical information from physicians. In Griswold v. Connecticut, supra, and the cases leading to Griswold's recognition of a separate, independent right to privacy implied by principles within the Bill of Rights, the state statutes at issue were held unconstitutional because they unduly interfered with an individual's right to make important decisions affecting himself, such as choices concerning contraception, procreation, marriage, family relationships, and child rearing and education. See authorities cited in Hondroulis v. Schuhmacher, supra, at 414. If the state is permitted to carry out its plan, Perry not only would be deprived of his right to make important medical choices affecting his mind, body and well-being, but he also would be forced to submit to the physical intrusion of powerful, dangerous and unpredictable drugs into his body and brain, and compelled to yield control of his thoughts and will to the state for the purpose of implementing his execution.

C. Application of the Compelling State Interest Test
Although the right to privacy or personhood is not absolute, we indicated in Hondroulis v. Schuhmacher, supra, that where a decision as fundamental as those included within the right of personal privacy is involved, state action imposing a burden on it may be justified only by a compelling state interest, and the state action must be narrowly confined so as to further only that compelling interest. Id. at 415. Only such strict judicial scrutiny is sufficiently protective of a person's right of privacy or personhood to avoid unwarranted governmental interference with his body, mind, and medical autonomy. Id.; accord: Kramer v. Union Free School Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); People v. Medina, 705 P.2d 961, 975 (Colo.1985); Guardianship of Roe, 383 Mass. 415, 421 N.E.2d 40 (1981).
We see no reason for the state's proposed action in the present case to be measured by a less rigorous standard or receive less than strict scrutiny simply because it is sought to be implemented by the state through a court order rather than by legislative enactment. We turn to question, therefore, whether the court order directing that the prisoner be forcibly medicated and maintained with antipsychotic drugs at a certain level of competency for purposes of execution, is necessary to promote a compelling state interest, and is narrowly drawn to further only that interest.
*761 First, the state attempts to bring the involuntary drugging at issue in this case under the aegis of Washington v. Harper, supra, by arguing that although the forcible medication of Perry will further the state interests to be served by his execution, it will also advance Perry's medical interest and promote the state's interest in prison safety because his mental illness causes him to be a danger to himself and others. We believe these purposes were manufactured with the benefit of hindsight and did not in fact motivate the challenged court order. As we explained in distinguishing Harper above, the record reflects that the present proceeding was initiated by the trial court solely for the purpose of determining Perry's competence for execution, that the forcible medication was ordered solely to implement his execution and that forcible injection of antipsychotic drugs into his body to remove the obstacle to his execution is not in his ultimate medical interest.
Furthermore, even if prison safety and Perry's medical welfare were the state's true objectives, the trial court's order sweeps unnecessarily broadly and thereby invades the area of protected freedoms. See Aptheker v. Secretary of State, 378 U.S. at 508, 84 S.Ct. at 1664 and authorities cited therein. The state has within its power less drastic means of achieving the objectives of medically treating Perry for his own best interests and protecting others at the prison. La.R.S. 15:803.1 provides an example. Under this statute, a mentally ill prisoner may be medically treated involuntarily when "necessary to prevent harm or injury to the inmate or to others". Also he may be judicially committed to a treatment facility after a hearing at which the inmate is represented by counsel. Thus, the state action proposed in the present case is not narrowly confined to the interests of prison safety and the inmate's medical interest even if these were the state's objectives as asserted in argument.
Second, the state suggests alternatively that it has a compelling interest in medicating Perry in order to further the social goals to be advanced by the death penalty, i.e., the retribution and deterrence of capital crimes. For the reasons assigned in the next section of this opinion, however, we conclude that the execution of a forcibly medicated insane prisoner will not contribute to the goal of either retribution or deterrence of capital offenses. Consequently, the state has failed to demonstrate that its proposed infringement upon Perry's protected rights of privacy and personhood is outweighed by a compelling state interest that would be measurably advanced by carrying out the death sentence. The state's plan to use forcible medication as a means of effecting punishment is therefore unconstitutional and must be disallowed. However, because Perry's right of personhood and privacy is also protected under our state constitution's cruel, excessive and unusual punishment clause and cannot be adequately discussed without its consideration, we do not base our decision on Art. I, § 5 alone.

VI. HUMANE TREATMENT
The specific issue we address here is whether death, combined with forcible administration of antipsychotic drugs, is punishment that subjects an insane capital offender to cruel, excessive or unusual punishment, that consequently, by virtue of Art. I, § 20 of the 1974 Louisiana Constitution, is beyond the power of the state to inflict. We conclude that the death penalty as applied to an insane offender under these circumstances is unconstitutional. The punishment is cruel because it imposes significantly more indignity, pain and suffering than ordinarily is necessary for the mere extinguishment of life, excessive because it imposes a severe penalty without furthering any of the valid social goals of punishment, and unusual because it subjects to the death penalty a class of offenders that has been exempt therefrom for centuries and adds novel burdens to the punishment of the insane which will not be suffered by sane capital offenders.
Article I, § 20 was derived from the Eighth Amendment and similar guarantees appearing in earlier state constitutions. La. Const.1921, Art. I, § 12; La. Const. 1913, Art. 12; La. Const.1898, Art. 12; La. *762 Const.1879, Art. 9; La. Const.1868, Art. 8; La. Const.1864, Arts. 94, 107. It adds, however, that no law shall subject any person to, "euthanasia", "torture", or "excessive punishment", broadening the prior prohibition against "excessive fines ... cruel and unusual punishment". La. Const.1921, Art. I, § 12; State v. Sepulvado, 367 So.2d 762 (La.1979). These additions expand in several instances the precepts that had evolved from the United States Supreme Court's interpretation of the Cruel and Unusual Punishments Clause of the Eighth Amendment. Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 63 (1974); Jenkins, "The Declaration of Rights," 31 Loy.L.Rev. 9, 39-40 (1975).
The most significant example of expansion is the deliberate inclusion of a prohibition against "excessive" punishment, which has been interpreted to add a protection of individual liberty surpassing that provided by the Eighth Amendment. Because of this provision, a person is protected not only from punishment that is cruel, excessive or unusual per se or as applied to particular categories of crimes or classes of offenders, but also from any excessive feature of a particular sentence produced by an abuse of the sentencer's discretion, even though the sentence is otherwise within constitutional limits. State v. Telsee, 425 So.2d 1251 (La.1983); State v. Sepulvado, 367 So.2d 762 (La.1979).
The enhancement of the safeguards in several particulars and the convention history in general indicate that Article I, § 20 affords no less, and in some respects more, protection than that available to individuals under the Cruel and Unusual Punishments Clause of the Eighth Amendment at the time of the adoption of our state constitution. Accordingly, this court has considered the United States Supreme Court opinions and other jurisprudence preexisting the adoption of the 1974 Louisiana Constitution as the threshold, but not the determinant, of the right to humane treatment declared by Art. I, § 20. See State v. Sepulvado, supra, at 746-66; see also Hargrave, supra, at 63.
In the leading case, State v. Stetson, 317 So.2d 172 (La.1975), this court was called upon to decide whether mandatory life imprisonment for the crime of distribution of heroin was cruel, excessive or unusual punishment. The court reviewed the concurring opinions of the Justices in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Douglas, J., concurring); id. 408 U.S. at 257, 92 S.Ct. at 2735 (Brennan, J., concurring); id. at 306, 92 S.Ct. at 2760 (Stewart, J., concurring); id. at 310, 92 S.Ct. at 2762 (White, J., concurring); id. at 314, 92 S.Ct. at 2764 (Marshall, J., concurring) and other jurisprudence and derived four principles or generalized criteria for assessing the constitutional validity of punishments under Art. I, § 20: the punishment must not be (1) degrading to the dignity of human beings; (2) arbitrarily inflicted; (3) unacceptable to contemporary society; or (4) excessive, i.e., disproportionate to the crime or failing to serve a penal purpose more effectively than a less severe punishment. Id. at 177. Applying these principles, this court concluded that the penalty was constitutional. Id.

A. Background of the Principles of Humane Treatment
The principles recognized by this court in the Stetson case as being appropriate for evaluating punishment under Art. I, § 20 were distilled by the Furman court's opinions from a rich background of jurisprudence. We refer to pertinent parts of that development for insight with which to apply the principles of humane treatment to the present case.
As this court stated in Stetson, the primary principle of the right to humane treatment is that a punishment must not be degrading to the dignity of human beings. This basic principle deals with society's obligation to itself and its members to treat each individual as a human being. The other three principles of humane treatment banning excessive, arbitrary and socially unacceptable punishment pertain to specific indicia of inhumane treatment and to the state's obligation to treat each individual or class of persons humanely in comparison with its treatment of others. We will describe *763 each of these principles generally before applying them one by one to the circumstances of the present case.
The principal hallmark of any punishment that is degrading to the dignity of human beings is that it treats members of the human race as non-humans. This results when a person is treated as a thing or as a means to the state's ends, rather than as a fellow human, resulting in extremely degrading physical or mental suffering. Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (expatriation); Weems v. U.S., 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910) (cadena temporal); Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1878). The barbaric punishments condemned by history, "punishments which inflict torture, such as the rack, the thumbscrew, the iron boot, the stretching of limbs and the like," are, of course, "attended with acute pain and suffering." O'Neil v. Vermont, 144 U.S. 323, 339, 12 S.Ct. 693, 699, 36 L.Ed. 450 (1892) (Field, J., dissenting). The true significance of the unconstitutionality of these punishments, however, is their inconsistency with the fundamental premise of the Cruel and Unusual Punishments Clause that even the vilest criminal remains a human being both possessed and deserving of common human dignity. Furman v. Georgia, 408 U.S. 238, 273, 92 S.Ct. 2726-27, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring). For example, in Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 464, 67 S.Ct. 374, 376, 91 L.Ed. 422 reh'g denied, 330 U.S. 853, 67 S.Ct. 673, 91 L.Ed. 1295 (1947), the Court concluded that it was not unconstitutional to force a prisoner to undergo a second effort to electrocute him after a mechanical malfunction thwarted the first attempt. The unsuccessful electrocution, although it caused mental anguish and physical pain, was the result of "an unforeseeable accident." Had the failure been intentional rather than a mishap, the punishment would have been, like torture, so degrading and indecent as to amount to a refusal to accord the offender human status. Id. 329 U.S. at 471-72, 67 S.Ct. at 380-81 (Frankfurter, J., concurring).
A state also may not constitutionally inflict punishment for the mere status one assumes in life, for to do so is to treat an individual as a thing rather than a fellow human being. Consequently, a state may not lawfully punish a person for being "mentally ill, or a leper, or ... afflicted with a venereal disease," or for being addicted to narcotics. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Furthermore, punishment may be degrading simply by reason of its enormity. A prime example is expatriation, a "punishment more primitive than torture," Trop v. Dulles, 356 U.S. at 101, 78 S.Ct. at 598; such punishment was held to be unconstitutional because it necessarily involves a denial by society of the individual's existence as a member of the human community. Furman v. Georgia, 408 U.S. at 273-74, 92 S.Ct. at 2743-44 (Brennan, J., concurring).
The remaining principles are complementary of the primary concept of human dignity. They prohibit the three archetypes of punishment that degrade the dignity of human beings i.e., excessive, arbitrary and socially unacceptable punishment. Frequently, they have been applied to prevent the state's application of a type of punishment to a particular class of offenders that would be inhumane in comparison with its treatment of others.
The second principle is that the state must not arbitrarily inflict a severe punishment. The very words "cruel and unusual punishment" imply condemnation of the arbitrary infliction of severe punishment. The state does not respect human dignity when it inflicts upon a person or a class of persons a severe punishment that it does not inflict on others for committing the same act or offense. Furman v. Georgia, supra 408 U.S. at 274, 92 S.Ct. at 2744 (Brennan, J., concurring).
While fear of torture was the central concern of the Framers of the Eighth Amendment, its English background indicates that the concern for regularity and generality in the imposition of severe punishment also underlies the Clause. A. Goldberg and A. Dershowitz, Declaring the *764 Death Penalty Unconstitutional, 83 Harv. L.Rev. 1773, 1789 (1970). The incident which prompted inclusion of the cruel and unusual punishment protection in the 1688 English Bill of Rights was the prosecution and punishment of Titus Oates, a minister of the Church of England, for two counts of perjury in 1685. Oates was convicted on both counts and sentenced to (1) pay a substantial fine, (2) life imprisonment, (3) whippings, (4) pilloring four times a year, and (5) to be defrocked. Id. Although none of these punishments was considered torture at that time, the English Parliament called for his release, calling the penalty "inhumane and unparalleled." Therefore, "cruel and unusual" seems to have originally meant a severe punishment unauthorized by statute and not within the jurisdiction of the court to impose. A. Grannuci, Nor Cruel and Unusual Punishments Inflicted: The Original Meaning, 57 Calif.L.Rev. 839, 859 (1969). See Furman v. Georgia, supra, 408 U.S. at 428, 92 S.Ct. at 2823 (Burger, C.J., dissenting).
By its attention to the use of a particular penalty outside of the jurisdiction involved, the United States Supreme Court implicitly affirmed the principle that for a punishment to withstand scrutiny under the Eighth Amendment, it must not be arbitrary. See Wilkerson, supra; Weems, supra; Trop, supra. Judicial scrutiny in this context reflects not only a measurement of evolving standards of decency but also a reference to the anomaly of the punishments in question. When an individual is singled out because of an accident of geography for unusually severe treatment, it seems particularly cruel. Moreover, as the Court observed in Trop v. Dulles, supra, 356 U.S. at 100-01 n. 32, 78 S.Ct. at 597-98 n. 32, "[i]f the word `unusual' is to have any meaning apart from the word `cruel'... the meaning should be the ordinary one, signifying something different from that which is generally done." Goldberg & Dershowitz, supra 1789. Neither the cadena temporal in Weems nor the expatriation in Trop was authorized elsewhere. In Wilkerson the Court reviewed various treatises on military law in order to demonstrate that under "the custom of war," shooting was a common method of inflicting the punishment of death. 99 U.S. at 133-34.
The constitutional protection against arbitrary punishments was explicitly recognized in Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947). Focusing on the manner in which the first abortive attempt to electrocute Francis had been conducted, the Court spoke of the "[p]rohibition against wanton infliction of pain [that] has come into our law from the Bill of Rights of 1688." Id. 329 U.S. at 463, 67 S.Ct. at 376. In the Court's opinion, Francis had not been subject to the wanton or arbitrary infliction of pain; the extra pain he suffered was unavoidably accidental. See also Goldberg & Dershowitz, supra at 1791.
The third principle inherent in the guarantee of humane treatment is that a severe punishment must not be excessive. The inquiry into "excessiveness" has two aspects. First, the infliction of a severe punishment by the state cannot comport with human dignity when it is unnecessary and nothing more than the pointless infliction of suffering. A particular punishment, therefore, is unconstitutionally excessive if it does not make any measurable contribution to the goals that such punishment is intended to achieve. Furman v. Georgia, 408 U.S. 238, 279-80, 92 S.Ct. 2726, 2747, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring); id. 408 U.S. at 311-12, 92 S.Ct. at 2763 (White, J., concurring); id. at 342-57, 92 S.Ct. at 2778-87 (Marshall, J., concurring); id. at 392-93, 92 S.Ct. at 2805-06 (Burger, C.J., dissenting); Weems v. U.S., supra, 217 U.S. at 381, 30 S.Ct. at 554; Wilkerson v. Utah, 99 U.S. at 136. Second, the punishment must not be grossly out of proportion to the severity of the crime. Trop v. Dulles, supra, 356 U.S. at 100, 78 S.Ct. at 597 (plurality opinion); Weems v. U.S., supra, 217 U.S. at 367, 30 S.Ct. at 549.
In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) the Supreme Court discussed the "excessiveness" inquiry with respect to the death penalty. Although Gregg was decided after the *765 adoption of Art. I, § 20, the lead opinion relied primarily on decisions pre-existing our state constitution and therefore may be considered as an indication of the minimum level of protection afforded by the state constitutional right to humane treatment. The Gregg plurality stated that the death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders. 428 U.S. at 183-84, 96 S.Ct. at 2929-30 (citing Furman v. Georgia, 408 U.S. at 394-95, 92 S.Ct. at 2806-07 (Burger, J., dissenting); id., at 452-54, 92 S.Ct. at 2835-36 (Powell, J., dissenting)); Powell v. Texas, 392 U.S. 514, 531, 88 S.Ct. 2145, 2153, 20 L.Ed.2d 1254 (1968). Therefore, when a particular application of the death penalty fails to measurably contribute to either of these goals it clearly is unnecessary and involves the wanton infliction of pain.
The final principle of humane treatment is that a severe punishment must not be unacceptable to contemporary society. As the Supreme Court has noted, the Cruel and Unusual Punishments Clause "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, supra, 356 U.S. at 101, 78 S.Ct. at 597. Rejection by society is a strong indication that a particular severe punishment does not comport with human dignity. In practice, most of the Supreme Court opinions prior to 1974 tended to rely upon objective indicia of attitudes actually prevailing among civilized people: historic usage of particular punishments, Wilkerson v. Utah, supra, (firing squad usage in Utah Territory and the Army); statutory authorization in other jurisdictions, Weems v. U.S., supra (cadena temporal had no equivalent in the United States); Trop v. Dulles, supra, (expatriation unused by other civilized nations); general public opinion, Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 471, 67 S.Ct. 374, 380, 91 L.Ed. 422 (1947) (Frankfurter, J., concurring); and a combination of present acceptance with past usage, Trop v. Dulles, supra, 356 U.S. at 99, 78 S.Ct. at 597. See also Robinson v. Calif., 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); Weems v. U.S., 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). Goldberg & Dershowitz, supra, at 1780-82.
Thus, whether there are objective factors from which a court can conclude that contemporary society considers a severe punishment unacceptable is the issue. Moreover, the acceptability of a severe punishment is measured by its actual use, not its availability, for it might become so offensive as never to be inflicted. Furman v. Georgia, 408 U.S. at 278-79, 92 S.Ct. at 2746-47 (Brennan, J., concurring). Objective evidence of contemporary notions of humanity and decency must be viewed, however, only as a threshold inquiry or the principle of humane treatment would merely legitimize advances already made and opinions already conventional. Goldberg & Dershowitz, supra, at 1782.
The four principles or generalized criteria provide the means by which a court can determine whether a challenged punishment is consistent with human dignity. They are, therefore, interrelated, and in most cases it will be their convergence that will justify the conclusion that a punishment is "cruel, excessive or unusual". The test, then, is a cumulative one: If a punishment is unusually degrading, if there is strong probability that it is inflicted arbitrarily, if it is substantially rejected by contemporary society, and if there is no reason to believe that it serves any valid goal of punishment more effectively than some less severe punishment, then the continued infliction of that punishment violates the command that the state may not inflict inhuman and uncivilized punishments upon those convicted of crimes. Furman v. Georgia, 408 U.S. at 282, 92 S.Ct. at 2748 (Brennan, J., concurring).

B. Application of Principles of Humane Treatment
The Stetson principles or generalized criteria of humane treatment, when applied to the punishment proposed by the state in the present case, converge to compel the conclusion that the forcible administration of antipsychotic drugs to induce competence for execution, compounded by execution itself, would be cruel, excessive, and unusual punishment. The state's medicate-for-execution *766 scheme is thus unconstitutional.
The punishment intended for Perry is severely degrading to human dignity. It will involve far more than the mere extinguishment of human life. Unlike other death row prisoners, Perry will be forced to yield to the state the control of his mind, thoughts and bodily functions, ingest or absorb powerful toxic chemicals, and risk or suffer harmful, possibly fatal, drug side effects. He will not be afforded a humane exit but will suffer unique indignities and degradation. In fact, he will be forced to linger for a protracted period, stripped of the vestiges of humanity and dignity usually reserved to death row inmates, with the growing awareness that the state is converting his own mind and body into a vehicle for his execution. In short, Perry will be treated as a thing, rather than a human being, and deliberately subjected to "something inhuman, barbarous" and analogous to torture.
The punishment the state plans for Perry is arbitrary in its conception and is apt to be arbitrary in practice. The punishment is anomalous, irregular and without general application. No insane offender has been executed in the civilized world for centuries. There is no statute in this or any other jurisdiction authorizing the execution of an insane offender or the involuntary medication of a prisoner for this purpose. Moreover, the trial court by ordering the state to medicate Perry forcibly if necessary has created an opportunity for further arbitrariness in application. The trial court's order places any physician having a duty to treat Perry for his mental illness in a severe conflict of interest, as we have noted in distinguishing forcible medication for execution from forcible medical treatment for safety and health. In short, whether the doctor prescribes and administers antipsychotic drugs or refuses to do so, he must act contrary to his patient's best medical interests either by promoting the execution of his patient or by failing to alleviate suffering. In this ambiguous situation there is great risk that physicians who choose to forcibly administer drugs may pursue the clear goal of execution more vigorously than the vaguer duty of protecting the inmate from drug side effects; and there is danger that the involuntary dispensation may be removed effectively from physicians' hands altogether. Under these circumstances there will be increased danger of arbitrariness and capriciousness in both the forcible administration of drugs and the determination of competence for execution.
The punishment that the state seeks to carry out on Perry is excessive because it makes no measurable contribution to the acceptable goals of capital punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering. Of the social goals of criminal punishment, the death penalty may be said to further only two, viz., retribution and deterrence of capital crimes. See Gregg v. Georgia, supra (restating principles advanced by members of the Court in Furman v. Georgia, supra, and prior decisions). Executing insane offenders after violating their rights of personhood by forcibly administering antipsychotic drugs to them against their wills, however, does not measurably further either the goal of deterrence or retribution.
The Supreme Court has noted that statistical attempts to evaluate the worth of the death penalty as a deterrent to crimes by potential offenders have been inconclusive. Gregg v. Georgia, supra, 428 U.S. at 184, 96 S.Ct. at 2930 (citations omitted). The Gregg plurality assumed that for some offenses and offenders the death penalty is a significant deterrent, viz., carefully contemplated murders, such as murder for hire, and murder by a life prisoner. Id. at 185-86, 96 S.Ct. at 2930-31. However, it is highly unlikely that the deterrent value of the death penalty will be increased measurably by including within the class of convicted offenders who may be executed a category that has been exempt from execution for centuries, viz., the insane. The likelihood is remote at best that a capital offender, capable of the kind of cost-benefit analysis that would make him susceptible to being deterred by the possibility of execution, would attach crucial weight to the *767 fact that he cannot be executed should he become insane after being apprehended, convicted and sentenced to death. Cf. Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988); Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (Brennan, J., dissenting); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Under these circumstances, the threat of execution is too attenuated to be of substantial service to criminal justice. See Furman v. Georgia, supra, 408 U.S. at 391, 92 S.Ct. at 2804 (White, J., concurring).
Furthermore, the state's execution of insane prisoners by means of forcible medication does not measurably contribute to the social goal of retribution. The pursuit of retribution, like that of any single social aim, has its restrictive qualifiers. H.L.A. Hart, Responsibility and Punishment, 10 (1968). The principles limiting the unqualified pursuit of retribution include respect for human dignity and equivalence between crime and punishment. Because the punishment planned by the state in the present case would violate these restrictive principles we conclude that the state cannot legitimately further the goal of retribution by this means. See J.G. Murphy, Retribution, Justice, and Therapy 227 (1979) (citing I. Kant, The Philosophy of Law (W. Hastie trans. 1887)); H.L.A. Hart, Punishment and Responsibility: Essays in the Philosophy of Law 231 (1968).
The retributory theory of punishment presupposes that each human being possesses autonomy, a kind of rational freedom which entitles him or her to dignity and respect as a person which is morally sacred and inviolate, but that an original social contract was entered by which the people constituted themselves a state. Murphy, supra at 68, 65; Murphy, Kant: The Philosophy of Right, Ch. 4 (1970); Kant, The Philosophy of Law (1887). Accordingly, in order to enjoy the benefits that a legal system makes possible, each person must make the sacrifice of obeying the law even when it is personally undesirable. If the system is to remain just, therefore, it must be guaranteed that those who disobey will not gain unfair advantage over those who abide by the law. Criminal punishment is used to maintain the proper balance by insuring that the law breaker derives no profit from wrongdoing. The criminal who chooses not to sacrifice by exercising self-restraint and obedience elects, in effect, to sacrifice in another waynamely, by paying the prescribed penalty. Murphy, supra at 83, citing Kant, Metaphysische Anfangsgrunde der Rechtslehre, 331, 332, 335 (1797).
In strictest or most severe form the theory of retribution asserts, among other things, that a person's punishment must in some way match, or be the equivalent of, the wickedness of his offense. H.L.A., Punishment and Responsibility, 231 (1968). To many this is the most perplexing feature of the strict model of retributory theory. The simple equivalencies of an eye for an eye or a death for a death seem either repugnant or inapplicable to most offenses. Therefore, instead of equivalence between particular punishments and particular crimes, modern retributive theory is concerned with proportionality. Id. 233-34.
Because retribution is a theory which respects human dignity, regards human beings as responsible agents and not merely as things or resources to be manipulated for the social good, however, even strict retributivists agree that there are some things which should not be done to a criminal even if he has done them to others. Murphy, supra, 85, 90, citing Rechtslehre at 363. Immanuel Kant, the leading defender of the severe form of retribution, argued that the state should never do anything to a criminal that humiliates and degrades his dignity as a human being. Id.
Speaking of the death penalty, in a passage having great significance to the present case, Kant argued that, while a murderer must forfeit his life as a match or equivalent to his crime, the state cannot inflict suffering more than necessary to take his life: "[w]hoever has committed murder must die.... His death, however, must be kept free from all maltreatment that would make the humanity suffering in his person loathsome or abominable." Kant, The Philosophy of Law, supra, at *768 198. Consequently, we conclude that even the strictest retributivist would disapprove of the forcible administration of antipsychotic drugs to implement prisoners' executions because this would violate the cardinal principle of retribution that the state cannot degrade human dignity or maltreat any criminal.
As members of the Supreme Court have noted, "retribution is not inconsistent with our respect for human dignity." Furman v. Georgia, 408 U.S. at 394-395, 92 S.Ct. at 2806-07 (Burger, C.J., dissenting); id., at 452-454, 92 S.Ct. at 2835-36 (Powell, J. dissenting); Powell v. Texas, 392 U.S. 514, 531, 535-536, 88 S.Ct. 2145, 2153, 2155-56, 20 L.Ed.2d 1254 (1968) (plurality opinion). Indeed, the opinions of the Court have, in effect, adhered strongly to the concept that to exact significantly more punishment than death simpliciter from a capital offender would be maltreatment or torture demeaning his dignity and not a proportionate or even an equivalent punishment. See Louisiana ex rel. Francis v. Resweber, supra; Wilkerson v. Utah, supra; In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). Moreover, if retribution could serve as justification for heaping an extra amount of indignity and suffering on a murderer because his crime was particularly vile, the "cruel, excessive and unusual" language would be read out of the Constitution; torture and atrocities would be permissible despite their being historically the clearest cases of forbidden inhumane punishment. Furman v. Georgia, supra, 408 U.S. at 408-10, 92 S.Ct. at 2813-14 (Marshall, J., concurring).
In light of these principles, we are convinced that the regime of punishment proposed by the trial court's order does not measurably contribute to the goal of retribution. Rather than calling upon Perry to suffer only the extinguishment of his life in a humane manner, the state would have him undergo a course of maltreatment that is inherently loathsome and degrading to his dignity as a human being. Unlike sane death row prisoners who retain dignity until the end, Perry would be forced to endure the usurpation of control of his body and mind by the state and the deprivation of medical treatment in his best interests before he is dispatched by the lethal injection. He must experience an indefinite period of indignity, anxiety and fear, assimilating unwanted antipsychotic drugs into his brain and body against his will at the risk of harmful and fatal side effects. He will go through this painful test involving his intimate mental and bodily processes without the aid of a trusted physician acting in his welfare and in whom he can confide. There is in this process of executing the death sentence no match, equivalence or proportionality. These circumstances amount to more than the mere extinguishment of life; they degrade human dignity and reach a sum in which there is something inhuman, barbarous, and analogous to torture.
Finally, we conclude that the compound of forcible medication and death that the state seeks to impose on Perry is a severe punishment unacceptable to contemporary society. After taking into account objective evidence of contemporary values, it is evident that the punishment would offend civilized standards of decency.
The prohibition against executing a prisoner who has lost his sanity has impressive historical and contemporary credentials. After being observed in the common law for centuries, it took root in America where it is followed unanimously today. Of the 36 death penalty jurisdictions, more than 20 have enacted statutory provisions prohibiting the execution of insane capital offenders. See Ala.Code § 15-16-23 (1982); Ariz. Rev.Stat.Ann. § 13-402 (1982); Ark.Code Ann. § 16-90-506 (1987); Cal.Penal Code §§ 3700-3704 (West 1982); Colo.Rev.Stat. § 16-8-110 (1986); Conn.Gen.Stat. § 54-101 (1985); Fla.Stat.Ann. § 922.07 (West 1985); Ga.Code Ann. § 17-10-61 to -63 (Harrison 1990); Ill.Rev.Stat. ch. 38, ¶ 1005-2-3 (1982); Kan.Stat.Ann. § 22-4006 (1988); Ky.Rev.Stat. § 431.240 (1985); Md.Code Ann. art. 27, § 75A(a)(2)(ii) (1990); Mass.Gen.Laws Ann. ch. 279, § 62 (West Supp.1992); Miss.Code Ann. § 99-19-57 (Supp.1985); Mo.Ann.Stat. § 552.060 (Vernon 1989); Mont.Code Ann. §§ 46-19-201 to -202 (1985); Neb.Rev.Stat. § 29-2537 *769 to -2538 (1978); Nev.Rev.Stat. §§ 176.415 to 455 (1986); N.M.Stat.Ann. § 31-14-4 to 31-14-7 (1984); N.Y.Correct.Law §§ 655-57 (McKinney 1987); Ohio Rev.Code Ann. § 2949.28-30 (Baldwin 1992); Okla. Stat.Ann. tit. 22 §§ 1005-1008 (1986); Utah Code Ann. § 77-15-3 to -5 and § 77-19-8 to -13 (1990); Wyo.Stat. §§ 7-13-901 to -903 (1987). Other states provide for the transfer of all mentally incompetent prisoners to the state hospital. See Del.Code Ann. tit. 11, § 406 (1987); Ind.Code Ann. § 11-10-4-1 to XX-XX-X-X (Burns 1988); N.C.Gen.Stat. § 15A-1001 to 1002 (1988); S.C.Code Ann. § 44-23-210 (Law.Co-op. 1985); Va.Code § 19.2-177.1 (1990). Four states have adopted, by case law, the common law rule prohibiting the execution of the insane. State v. Allen, 204 La. 513, 15 So.2d 870 (1943); Commonwealth v. Moon, 383 Pa. 18, 117 A.2d 96 (1955); Jordan v. State, 124 Tenn. 81, 135 S.W. 327 (1911); State v. Davis, 6 Wash.2d 696, 108 P.2d 641 (1940) (dictum). Idaho has a statute that provides for the adoption of the common law absent an explicit statutory provision. Idaho Code § 73-116 (1989). In sum, the overwhelming weight of objective evidence of contemporary values in state statutes and common law indicates that society will not tolerate any exception to the widely and deeply held prohibition against executing the insane.
The ethical standards of the medical profession reinforce this view and constitute further objective evidence of this standard of decency. Both the American Medical Association and the American Psychiatric Association have strongly urged physicians not to participate in legalized state executions. See Ewing, Diagnosing and Treating "Insanity" on Death Row: Legal and Ethical Perspectives, 5 Behav.Sci. & L. 175, 176 (1987). Like the use of lethal injections, forcible medication in an attempt to restore competency constitutes a part of capital punishment that inherently conflicts with medical ethics. Horton, 44 S.W.L.J. at 1213; Sargent, Treating the Condemned to Death, Hastings Center Report at 6 (Dec. 1986); Salguero, Medical Ethics and Competency to be Executed, 96 Yale L.J. 167 at 178, n. 64.
Furthermore, the state cannot avoid contending with the force of this objective evidence by invoking the deferential judicial review standards adopted by the United States Supreme Court in assessing the constitutionality of a state's particular statutory punishment under the Eighth Amendment. In such cases, the Supreme Court has said that it will presume the validity of the statute and that a heavy burden rests on those who challenge the statute. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The reasons cited for these rules were the deference the court owes to state legislatures under our federal system, its reluctance to become the arbiter of the standards of criminal responsibility throughout the country, and the difficulty of changing the high court's interpretations through constitutional amendment. Id.
The present case is clearly distinguishable from those in which the United States Supreme Court announced its Eighth Amendment review standards. Perry does not attack a death penalty statute in this case on the grounds of newly evolved standards of decency. Instead, Perry seeks to uphold the prohibition against executing the insane that was jurisprudentially adopted by this court and has been part of our law for nearly a century. Because the prohibition has not been expressly modified by the legislature, it must be presumed to have been tacitly approved by the lawmakers. Therefore, the state's role in the present case is not that of a defender of a statute but a proponent of a novel interpretation of this court's jurisprudential rule. Furthermore, we do not consider Perry's Eighth Amendment attack in this opinion but resolve this case on state grounds alone. Accordingly, this case does not bring into play the deference that the United States Supreme Court owes to the state legislatures under the principles of federalism.
Considering that it is the state, and not the prisoner, that seeks a change in the status quo, in the form of a novel interpretation of the law and the recognition of a new exception to a well-established norm, *770 we conclude that the burden of justifying the proposed new legal precept must be allocated to the state, as its proponent and potential beneficiary. Accordingly, the state has the duty to present objective, persuasive evidence that it would not offend civilized standards of decency for a jurisdiction to medicate an insane prisoner against his will with antipsychotic drugs and use his involuntarily controlled mental condition as the means of his execution.
The state does not present any unequivocal objective evidence to show that the execution of the insane via forcible medication is acceptable to society. The state mainly begs the question by basing its conclusion that forcible medication renders the execution acceptable upon its own unproven assumption that only the insane prisoner's lack of comprehension stands in the way of an execution comporting with standards of decency. However, the state's invasion of the inmate's body, mind and autonomy in order to chemically alter his mental condition for execution is in itself inhumane treatment violating his right of personhood and privacy and has not been proven to be acceptable to society. Moreover, the insane prisoner's lack of understanding of his punishment is only one of the civilized qualms about executing the insane. The prohibition stems as well from other concerns, such as religious atonement, lack of deterrence and retribution, the insane person's inability to report exculpatory or mitigating evidence or to assist counsel, madness viewed as its own punishment, and the dignity of society itself. In the absence of objective proof to the contrary, we cannot say that these concerns are no longer important to society or that they can be dispelled by the forcible administration of antipsychotic drugs.
The evidence adduced by the state is equivocal and fails to prove that contemporary values have changed so as to require us to create an exception to the solid ban against executing the insane. The state first argues that the laws of other states permit the forcible administration of drugs to insane prisoners as a means of implementing executions. Specifically, the state relies on the provisions of some state statutes that reinstate the execution of the death penalty when an incompetent prisoner regains his sanity. We disagree with the state's interpretation of those statutes. The clear legislative intent of such laws is simply to adopt the common law rule under which an incompetent inmate may be executed if he should ever regain genuine sanity. The statutes do not authorize forcible drugging or the execution of an inmate during a temporary abatement of his psychotic symptoms by chemical means. The common law rule and many of its statutory adoptions antedate the use of antipsychotic drugs for the medical treatment of the mentally ill in this country. Therefore, the lawmakers could not have contemplated that the statutes would be used for such purpose. No state court has ever approved such a statutory interpretation or usage. In our opinion, these statutes do not constitute objective evidence of society's acceptance of forcible administration of antipsychotic drugs as a tool of capital punishment.
Secondly, the state relies on a Maryland statute which provides that "[a]n inmate is not incompetent merely because his or her competence is dependent upon continuing treatment, including the use of medication" but also states that "[i]f the court finds the inmate to be incompetent it shall revoke the warrant to execute the death sentence and remand the case to the court in which the sentence of death was imposed, which shall strike the sentence of death and enter in its place a sentence of life imprisonment without the possibility of parole." Md. Code Ann. art. 27, 75(1)(a)(2)(ii) (1990). Reading the Maryland statute as outsiders without special competence in Maryland law, we have little confidence in our interpretation and application of that law in particular situations. However, under the statute, it is clear that once an inmate is found to be incompetent his death sentence must be converted to a sentence of life imprisonment and that his sentence cannot be changed again to capital punishment. It is also clear that the statute does not expressly authorize the state to medicate an inmate forcibly in an attempt to make an *771 insane prisoner competent for execution. In the absence of an explicit authorization we have grave doubts that a court could or should read such a meaning into the statute. Therefore, the Maryland law can hardly be considered objective evidence that the people of that state approve of the practice of forcible administration of antipsychotic drugs to prisoners as a means of implementing their executions. Furthermore, there is no indication that Maryland has ever attempted to use the statute to medicate an inmate forcibly for execution purposes. The acceptability of a severe punishment is measured by its use, not by its availability, for it might be so offensive to society as never to be inflicted. Furman v. Georgia, 408 U.S. at 279, 92 S.Ct. at 2746 (Brennan, J., concurring). Finally, no matter how the single Maryland statute is interpreted, the current judgment with respect to execution of the forcibly medicated insane would still weigh overwhelmingly on the side of rejecting the death penalty under such circumstances as being inhumane punishment. Cf. Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).
The execution of the insane, merged with the invasions of personhood inherent in the forcible administration of antipsychotic drugs for this purpose, therefore, is inconsistent with all four principles of humane treatment under our state constitution. Death under these circumstances is an unusually degrading and severe punishment. There is a strong probability that it will be inflicted arbitrarily. Its rejection by contemporary society is total. Such punishment is excessive because it does not serve either retribution or deterrence of potential capital offenses, the only recognized goals of capital punishment.
When this nation began death was not a unique punishment but was imposed as the penalty for numerous crimes. Execution of the insane, however, had been considered inhumane for centuries and was forbidden. Since that time, successive restrictions on the death penalty, imposed against the background of a continuing moral controversy, have drastically curtailed the use of capital punishment. For a state at this stage of the history of the usage of the death penalty to subject insane prisoners to execution under the pretense that they can be made "sane" by forcibly invading their minds, bodies and personhood with antipsychotic drugs, clearly would constitute cruel, excessive and unusual punishment.

VII. CONCLUSION
The trial court's determination and order are affirmed in part and reversed in part. The trial court's effective determination that Perry is insane and incompetent for execution is affirmed. The trial court's order authorizing and requiring the state to administer antipsychotic drugs to Perry against his will for purposes of execution is reversed. The execution of the death sentence upon Perry is stayed. In order to modify this stay order the state must demonstrate to this court that Perry has achieved or regained his sanity and competence for execution independently of the effects or influence of antipsychotic drugs.
IT IS SO ORDERED.
WATSON, J., joins the opinion and adds brief additional reasons.
LEMMON, J., concurs and assigns reasons.
HALL, J., concurs to note that he joins in the opinion but does not fully subscribe to all that is said in Section V of the opinion.
MARCUS, J., dissents and assigns reasons.
COLE, J., dissents for reasons to be assigned.
WATSON, Justice, concurring.
I join the opinion and concur to note that the basic questionwhether civilized society can medicate an insane person to make him temporarily sane in order to kill him almost answers itself. There is no overwhelming need to execute this crazy man. Such barbarous action requires strong penological interest, not present here.
*772 LEMMON, Justice, concurring.
I join in Section VI of the majority opinion holding that the trial court's order authorizing and requiring the state to administer antipsychotic drugs to defendant against his will for the sole purpose of execution constitutes cruel, excessive and unusual punishment in violation of La. Const. art. I, § 20.
Capital punishment, while constitutionally permissible for a sane person guilty of first degree murder, is an inappropriate punishment for a person who cannot understand the nature of the penalty or the reason for his being subjected to that penalty unless he is forcibly medicated for the sole purpose of being made competent to undergo execution. The state can achieve its legitimate penological interest in enforcing its criminal laws (which prescribe either death or imprisonment for life without benefit of parole as the penalties for first degree murder), and societal order can be preserved, without the necessity of executing a person who is spending the remainder of his life in prison and who is insane except for forcibly administered medication.
MARCUS, Justice (dissenting).
In 1985, Michael Owen Perry was convicted of five counts of first degree murder of five family members.[1] The jury subsequently recommended that Perry be sentenced to death on all five counts. On appeal, this court affirmed his convictions and sentences.[2] The court noted that under State v. Allen, 204 La. 513, 15 So.2d 870 (1943) and Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), the state is prohibited from executing one who has become insane subsequent to his conviction of a capital crime; therefore, counsel for defendant may apply to the trial court for appointment of a sanity commission to determine whether Perry has become insane subsequent to his convictions and lacks the capacity to understand the death penalty.
On January 21, 1988, the trial court appointed a sanity commission to determine Perry's present sanity. Based upon recommendations from the state and defense, the trial court appointed Drs. Glen Estes, Aris Cox, Theresita Jimenez, and Curtis Vincent, a clinical psychologist. Following the appointment of the sanity commission, the trial court granted defense counsel's ex parte motion authorizing him to represent Perry in these proceedings and to make decisions on Perry's behalf as deemed necessary and in his best interest. On March 14, 1988, Perry's counsel instructed the state prison authorities to remove Perry from all psychotropic medication.[3]
The trial court held its first sanity hearing on April 20, 1988, after Perry was fully evaluated by the sanity commission. The commission unanimously agreed that Perry suffered from schizo-affective disorder. The commission also expressed the opinion that psychotropic medication relieved the symptoms of that disorder; however, the commission was somewhat divided on the issue of competence to undergo execution with the majority expressing an opinion that Perry was competent to undergo execution. Dr. Jimenez, a psychiatrist who had examined Perry in the past, testified that Perry "does understand that he is convicted of the death of his family and he does understand that the penalty is death." Dr. Cox, also a psychiatrist who had examined Perry in the past and was Perry's treating physician at Angola, testified that Perry was "aware that he could be killed by the electrocution, and he was aware of why he was there." He also testified that *773 when he examined Perry, Perry was on psychotropic medication and "functioning about as well" as he had ever seen him function. Dr. Vincent, a clinical psychologist who had also examined Perry in the past, testified that Perry "has the understanding that if an individual murders somebody and they can be found guilty and then could be executed legally." Dr. Estes, a psychiatrist who had met with Perry only once for about an hour, testified that he "did not conclude that he [Perry] understood his sentence, his punishment for what he did wrong."
The trial court took the matter under advisement. Shortly after the hearing (April 29, 1988), Perry's counsel authorized the state prison authorities to resume Perry's treatment with psychotropic medication. The trial court later requested the prison authorities to provide the court with periodic updated reports regarding Perry's mental status. Soon thereafter, Perry filed an objection to the introduction of his updated mental health reports into evidence. Additionally, as a result of the trial court's request for those reports, Perry's counsel requested the prison authorities to discontinue Perry's treatment with psychotropic medication.
A few months later, the trial court overruled Perry's objection to the introduction of the status reports into evidence. The court also vacated its prior order authorizing Perry's counsel to make decisions on his behalf. Based on the newly-introduced status reports prepared by the prison authorities, the trial court concluded that there was a change in circumstances in Perry's mental health warranting a new evaluation. Therefore, a second sanity hearing was scheduled for September 30, 1988. The court requested two of the four physicians on the original sanity commission (Drs. Cox and Jimenez) to re-evaluate Perry. The trial court also ordered that Perry be forcibly maintained on psychotropic medication pending the second sanity hearing; however, upon Perry's application, this court stayed the order authorizing forcible medication.
At the second sanity hearing (October 21, 1988), the physicians again testified that Perry suffered from schizo-affective disorder; however, they again found that administration of psychotropic medicine would render Perry competent for execution. After the hearing, the trial court rendered the following judgment:
It is ordered that the defendant, Michael Owen Perry, is competent for purposes of execution in that he is aware of the punishment he is about to suffer and he is aware of the reason that he is to suffer said punishment.
It is further ordered that defendant's competency is achieved through the use of antitropic or antipsychotic drugs including Haldol and the Louisiana Department of Public Safety and Corrections is further ordered to maintain defendant on the above medication as to be prescribed by the medical staff of said Department and if necessary to administer said medication forcibly to defendant and over his objection.
Perry filed an application for supervisory writs to this court which was denied.[4] Perry then filed a petition for a writ of certiorari to the United States Supreme Court which was granted.[5] After briefing and argument, the Court vacated the judgment and remanded the case to the trial court "for further consideration in light of Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)."[6] On remand, the trial court reaffirmed and reinstated its original judgment, distinguishing Perry's case from Harper. The court noted that Harper involved prison regulations governing the forced medication of inmates in the interest of prison safety and security; whereas Perry's case involves forced medication of a death row inmate to render him competent for execution. The court held that the state's interest in obtaining *774 and satisfying the jury verdict (the death penalty) in this case outweighs Perry's right to refuse medication. In addition, the court found (for purposes of argument) that Perry was a danger to others and that the medication was in his best medical interest. Upon Perry's application, we granted certiorari to review the correctness of that decision.[7]
As I see it, the issues presented are 1) what level or standard of competency is necessary to undergo execution; 2) whether Perry can be forcefully medicated against his will so that he might achieve a level of competency sufficient to undergo execution; and 3) what procedural due process requirements are necessary before a death row inmate can be forcefully medicated for execution.

I. Mental Standard Required to Undergo Execution
It is well settled in this state that if a person convicted of a capital crime and sentenced to death later becomes insane, then that person cannot be executed. State v. Perry, 502 So.2d 543 (La.1986); State v. Allen, 204 La. 513, 15 So.2d 870 (1943). In Perry, this court stated that the state will not impose the death penalty on a person who becomes insane subsequent to his conviction for first degree murder if he "lacks the capacity to understand the death penalty." The United States Supreme Court addressed the issue in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). The majority held that execution of the mentally insane constituted cruel and unusual punishment under the Eighth Amendment to the United States Constitution; however, the majority did not address the level or standard of competency necessary to undergo execution. Noting the majority's failure to explain that standard, Justice Powell confronted the issue in a concurring opinion. He found that the minimum level of competency necessary under the Eighth Amendment to execute those under a sentence of death is an awareness of the punishment and why they are to suffer that punishment.
Perry argues that a capacity to understand the proceedings against him and an ability to assist counsel as interpreted in State v. Bennett, 345 So.2d 1129 (La.1977), are implicit in the mental standard to undergo execution. In Ford, 477 U.S. 399, 106 S.Ct. 2595, Justice Powell, in addressing a similar argument, i.e., the lack of an ability to make arguments on one's own behalf, found "slight merit" to that argument in a post-conviction setting. He noted that "modern practice provides for more extensive review of sentences and convictions than did the common law" and with that review it would be "unlikely indeed that a defendant could go to his death with knowledge of undiscovered trial error that might set him free." Ford, 477 U.S. at 420, 106 S.Ct. at 2607. Under the Louisiana Code of Criminal Procedure, the very nature of post-conviction proceedings precludes the necessity of an awareness of the proceedings and an ability to assist counsel.[8] I consider the minimum standard of competency necessary to undergo execution set forth in Ford to be a proper standard. I would therefore adopt the Ford standard, i.e., the ability of one to understand the death penalty and the reason one is to suffer that penalty, as the standard to undergo execution in this state.[9]
*775 A trial judge's determination of mental capacity is entitled to great weight, especially where the evaluation of credibility or the resolution of conflicting well-founded medical testimony is concerned. State v. Flores, 315 So.2d 772 (La.1975). Based on the testimony of the sanity commission, I would find that the trial judge did not abuse his discretion in holding Perry competent to be executed.

II. Can a Death Row Inmate Be Forcibly Medicated For Purposes of Execution
In its order, the U.S. Supreme Court directed the trial court to review its decision in light of Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). In Harper, the issue before the Court was "what factual circumstances must exist before the state may administer antipsychotic drugs to the prisoner against his will." Harper, 494 U.S. at 220, 110 S.Ct. at 1036. Specifically, the Special Offender Center of the state of Washington promulgated Policy 600.30 which provides for the involuntary administration of psychotropic medication to an inmate in the event a special committee of psychiatrists finds that the inmate suffers from a mental disorder and is gravely disabled or dangerous. The defendant, who was forcefully medicated under this policy, challenged the constitutionality of Policy 600.30, claiming his constitutional rights were violated as he had a protected liberty interest in refusing medication.
The Court recognized the defendant's liberty interest in refusing medication. According to the Court, that liberty interest was created by the justifiable expectation that Policy 600.30 prohibited the arbitrary administration of antipsychotic medication. Additionally, the Court found defendant possessed a significant liberty interest created by the Due Process Clause of the Fourteenth Amendment in refusing the unwanted medication. The Court explained, however, that "the extent of a prisoner's right under the Clause to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement." Harper, 494 U.S. at 222, 110 S.Ct. at 1037. The Court noted that it had previously held in Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), that "the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is reasonably related to legitimate penological interests." Harper, 494 U.S. at 222, 110 S.Ct. at 1037. In other words, when a prison regulation impinges on an inmate's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. Finding that Policy 600.30 was a rational means of furthering the state's legitimate objectives, i.e., prison safety and security, the Court held that the Due Process Clause permitted the state to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.
Under the guidance of Harper, I believe we must determine whether the instant case presents sufficient factual circumstances to warrant the administration of unwanted psychotropic medication to Perry. I have no doubt that under the Due Process Clauses of both the federal and state constitutions, Perry possesses a significant liberty interest to be free from unwanted medication. However, the Court in Harper noted that the liberty interest must be defined in the context of the inmate's confinement.
Finding that Perry possesses a liberty interest in refusing medication, I would *776 examine the state's interest in forcibly medicating Perry and decide whether his forced medication is reasonably related to that interest. Clearly, the state possesses a significant interest in the enforcement of its criminal laws. "One of the primary functions of government is the preservation of societal order through enforcement of criminal law...." Procunier v. Martinez, 416 U.S. 396, 412, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). Except as constitutionally limited, a state may choose means to protect itself and its people against criminal violation of its laws. Commonwealth ex rel. Sullivan v. Ashe, 302 U.S. 51, 55, 58 S.Ct. 59, 60, 82 L.Ed. 43 (1937). In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court explained:
The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders.
In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.
Having found a legitimate penological interest in the enforcement of its criminal laws, the final analysis mandated by Harper requires a determination of whether Perry's forced medication is reasonably related to this state interest. Apparently, the only way Perry can achieve a level of competence sufficient to undergo execution is through the administration of psychotropic medication. There does not seem to be any alternative method of treating Perry for his illness. Under Ford, a death row inmate must understand the nature of the death penalty and the reason he is to suffer that penalty. The administration of medication produces the required level of competence for Perry to undergo execution and is therefore consistent with his sentence. Since the forcible medication of Perry renders him competent for execution, society's objective in the enforcement of its criminal penalties is accomplished. I would conclude that under the rational relation test espoused in Harper, the forcible medication of Perry is reasonably related to a legitimate penological interest. Therefore, I would find Perry may be forcefully medicated to render him competent for execution.
Perry argues that under Harper and La. R.S. 15:830.1, an inmate can be forcibly medicated only after a finding that the inmate is a threat to himself or others and the administration of unwanted medication is in his best medical interest.[10] However, Harper and La.R.S. 15:830.1 contemplate the forced administration of antipsychotic medication in the context of the penological interest of prison safety and security. Neither Harper nor La.R.S. 15:830.1 addresses or precludes forced medication for execution, which is the penological interest involved in this case. While dangerousness and best medical interest are proper considerations in terms of forced medication to insure prison safety and security, they are not pertinent inquiries in the context of forced medication for execution. The state's objective in administering unwanted medication for execution is to render the inmate competent to undergo execution; whereas the state's objective under La.R.S. 15:830.1 and Harper is to insure prison safety and security. Therefore, Perry's argument is without merit.[11] In any event, *777 the trial court found Perry to be a danger to others, and the sanity commission was of the opinion that psychotropic medication relieved the symptoms of Perry's disorder with minimal side effects and was in his best medical interest.[12]

III. Procedural Due Process Necessary to Forcefully Medicate Perry
In Harper, the Court was also confronted with the issue of whether the procedure outlined in Policy 600.30 provided the defendant with procedural due process protections before he could be forcefully medicated. Under the Policy, a psychiatrist decided whether an inmate suffered from a mental disorder and was gravely disabled or posed a threat of harm to himself or others. If the inmate refused medication, he was entitled to a hearing before a special committee consisting of a psychiatrist, psychologist, and the Associate Superintendent of the Special Offender Center (none of whom were involved in the treatment of the inmate). The inmate would be given 24 hours notice of the hearing. He would also be given the right to attend the hearing, to present evidence, to cross-examine the witnesses, and the right to the assistance of a lay advisor who understood the psychiatric issues involved. If a majority of the committee found that the inmate suffered a mental disorder and was either gravely disabled or posed a threat of harm to himself or others, then the inmate could be medicated against his will. The inmate would be given the right to appeal to the Superintendent of the Center and the right to seek judicial review of the Center's decision by means of a personal restraint petition or extraordinary writ. The Court held that these procedures satisfied the defendant's right to procedural due process.
In the instant case, upon the recommendations of state and defense, the trial court appointed a sanity commission consisting of three psychiatrists and one psychologist to determine Perry's present sanity. The trial court held a contradictory sanity hearing after Perry was fully evaluated by the sanity commission. The trial court required the prison authorities to provide the court with periodic updated reports regarding Perry's mental health status. Finding a change in Perry's mental health, the trial court requested two of the four physicians on the original sanity commission to re-evaluate Perry. Subsequently, a second contradictory sanity hearing was held. Perry was represented by two attorneys throughout the proceedings. Finally, the trial court's decision was subject to review by this court. Clearly, the procedures adopted by the trial court satisfied Perry's right to procedural due process.[13]

CONCLUSION
In conclusion, I would adopt the Ford standard, i.e., the ability of one to understand the death penalty and the reason one is to suffer that penalty, as the required level of competency to undergo execution in this state. In addition, I would find that the trial judge did not abuse his discretion in finding that Perry was competent to be executed while maintained on psychotropic medication. Furthermore, I would hold that under the rational relation test espoused *778 in Harper, the forcible medication of Perry is reasonably related to the legitimate penological interest in enforcing the death penalty. Finally, the procedures adopted by the trial court in determining whether Perry could be medicated for execution satisfied his right to procedural due process.
For these reasons, I respectfully dissent and would affirm the judgment of the district court.
COLE, Justice, dissenting.
Our constitution is not intended to embody a particular sociological theory. Rather, "[i]t is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether [the state's position] embodying them conflict[s] with the [c]onstitution...." Lochner v. New York, 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937 (1905) (Holmes, J., dissenting).
Because I view the majority's fundamental premises as unsound, and because the result reached is one compelled neither by the language of the constitution nor the intent of its drafters, I respectfully dissent and briefly outline the areas of my disagreement.

I.
First, I disagree that providing one with medication to reduce or alleviate his distress is in some way not in his "best medical interest" merely because at some point thereafter a lawfully imposed death sentence may be carried out. The majority contends that because a physician is bound by oath both to alleviate suffering and to do no harm, he is not permitted to administer antipsychotic drugs "forcibly" since by doing so he knowingly handles the patient "harmfully and contrary to his ultimate medical interest." Administering the medication to one who thereafter is rendered competent for execution is claimed to prevent the prisoner from receiving adequate medical treatment for his mental illness. Even the majority acknowledges, however, that "[t]he physician's abstention from dispensing the drugs ... perpetuates suffering that ordinarily the physician is duty-bound to allay...." Supra at 752. This statement, to me, is indicative of the majority's quest to halt the execution of Perry because it offends the sensibilities of the majority. If, in fact, a physician is sworn to do no harm and to act only in the best medical interests of his patients, I fail to see how administering an antipsychotic drug manufactured to alleviate suffering in those for whom it is indicated, i.e., those manifesting overt psychotic symptoms, can reasonably be construed as doing harm or acting against the patient's best medical interests. The fact that subsequent to the treatment the patient recovers sufficiently to be subjected to the lawfully imposed death sentence does not somehow retroactively render the treatment medically contraindicated. To the contrary, it would seem the majority's consigning Perry to a life term not only in the state penitentiary but to a life term as the prisoner of his own delusions is far more pernicious than any of the effects brought about by the so-called medicate-to-execute structure. Prescribing and administering appropriate medication can scarcely be deemed punishment, at least not by any generally accepted definition of the term.

II.
The majority errs also in concluding that administering medically indicated antipsychotic drugs violates Perry's asserted rights under LA.CONST. art. I, § 5[1] to decide what is to be done medically with one's mind and body; to control one's own mind and thoughts; and to be free from unwarranted physical interference with one's brain and body.
Here, the majority seeks to have it both ways. On the one hand, the majority contends *779 Perry is so incompetent as to be unable to appreciate his surroundings, circumstances, or the nature of and reasons for the lawful sentence. Accordingly, the sentence cannot lawfully be imposed while he remains in his separate reality. On the other hand, the majority ascribes to the same individual the capacity to chart his own medical treatment plan, the ability to decide rationally what is to be done medically and what limits he wishes to impose, and, most curiously, the ability to control his own mind and thoughts.
The majority concludes that administering the drug to Perry and perhaps subsequently executing him would "usurp his fundamental right to make decisions regarding his health or medical treatment." Supra at 758. It is difficult to conceive of the state usurping a right to make decisions when the person whose right to make the decision is unable to make any rational decision or to appreciate the world around him.
The majority also catalogues in great detail the possible adverse effects of the medication sought to be imposed. The Physician's Desk Reference ("PDR"), quoted in the opinion, typically lists all reported side effects, no matter how infrequent the occurrence. One could, with little difficulty, peruse the PDR in search of a similar parade of horribles and find virtually all prescription medications may produce adverse, unintended consequences. That is precisely why they are sold only by prescription of a physician. That does not, however, render them instruments of torture any more than the occasional adverse consequences make Haldol monstrous, notwithstanding the majority's implication to the contrary. When it comes to a decision to treat psychosis with an available, proven treatment, or to allow the psychotic to remain in his disconnected state, it cannot be deemed unconstitutionally violative of some amorphous right of the psychotic to choose neglect over treatment.

III.
The majority has determined that executing a previously insane criminal, after administering to the criminal, purportedly against his "will," antipsychotic drugs, is unconstitutional because it subjects the individual to cruel, excessive, or unusual punishment, in violation of LA.CONST. art. I, § 20. To reach its conclusion, the majority employs the criteria set forth in State v. Stetson, 317 So.2d 172 (La.1975), namely, that the punishment must not be: degrading to the dignity of human beings; arbitrarily inflicted; unacceptable to contemporary society; or excessive, i.e., disproportionate to the crime or failing to serve a penal purpose more effectively than a less severe punishment. I disagree with both the premises and the conclusions of the majority as to each consideration.

A.
First, because I do not believe appropriate medical treatment can be deemed "punishment," I disagree with the majority that administering antipsychotic drugs to Perry while he remains in a psychotic state forms any part of the punishment to be meted out by the state. The fact that at some point thereafter, when Perry regains his competence, the state may carry out the lawfully imposed death sentence is of no moment. The death penalty has not been found to be degrading to human dignity. In fact, some have thought capital punishment indispensable to redeem, or restore, the dignity of the person executed. See, e.g., G. HEGEL, PHILOSOPHY OF RIGHT (T.M. Knox trans., 1962); I. KANT, THE PHILOSOPHY OF LAW: METAPHYSICAL PRINCIPLES OF THE SCIENCE OF RIGHT, pt. II 194-205 (W. Hastie, B.D. trans., 1887). The death penalty has been upheld by both state and federal courts as a legitimate means of expressing society's outrage at people who commit crimes such as the ones Perry committed.
The punishment intended for Perry, being executed by means of a lethal injection is most assuredly less severe than being electrocuted. As electrocution has been determined not to be unreasonably severe, a lethal injection administered while the prisoner is lying on a hospital gurney is certainly not.

*780 B.
The punishment intended for Perry is not being arbitrarily applied. Perry was accorded every due process right to which he is entitled, before, during, and after his trial. A jury convicted him of five counts of first degree murder and recommended the death penalty on all counts. This Court affirmed all convictions and sentences. State v. Perry, 502 So.2d 543 (La.1986). There is nothing arbitrary about seeking to carry out a lawfully imposed sentence.
What seems arbitrary to me is the fact that the survivors of the victims of Perry's crimes, as well as society at large, should be deprived of a just resolution of the matter through the fortuity of Perry's having become insane after conviction and sentence but before the sentence could be carried out. He was, after all, found sane at the time he committed the crimes, sane at trial (and thus able to assist in his defense), and sane at the time of conviction and sentence (so that he understood the nature of the punishment and the reason for its imposition). It seems to me arbitrary in the extreme that he should escape sentence for such heinous crimes while others who have not managed to become insane, and who perhaps truly repent, do not. One thing that will not be arbitrary but will be fairly predictable, however, is the number of present and future death row inmates who become "insane" upon reading the majority's opinion.

C.
The death penalty is, by virtue of its widespread support[2] and statutory enactment, not unacceptable to contemporary society. The fact that one has been previously adjudged insane, has been treated by legitimate medical procedures, and has, as a result, regained sanity sufficient to be exposed to the death penalty,[3] does not render the sentence unacceptable to contemporary society. Rather, I believe the converse to be true. American citizens grow increasingly appalled by, and alienated from, a legal system that affords criminals greater rights than law-abiding taxpayers. Contemporary society is awash with callous, cold-blooded killers who themselves are provided room, board, clothing, and medical care at taxpayers' expense for an average of 8-15 years from the time of the crime to the time (if ever) of execution. Restoring a convicted murderer to sanity and subsequently carrying out the sentence is in no way unacceptable to contemporary society.

D.
The majority asserts the punishment the state "seeks to carry out on Perry is excessive because it makes no measurable contribution to the acceptable goals of capital punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering." Supra at 766. Nothing could be further from the truth.
As previously noted, the survivors of Perry's victims, as well as society at large, are entitled to retribution for the heinous acts Perry committed. The fact that he fortuitously, perhaps conveniently, became insane prior to his execution does not detract from the legitimacy of his sentence. Likewise, the fact that he may be chemically restored to sanity, and then executed, does not denigrate the verdict, the sentence, or the process. Society is entitled to express its legitimate outrage at those who have served notice on it that they are unwilling to abide by its most basic principles. Retribution, indeed, "is a legitimate dimension of the punishment of crimes." Furman v. Georgia, 408 U.S. 238, 394, 92 S.Ct. 2726, 2806, 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting).
*781 The majority cites Immanuel Kant, noting his belief that the state's punishment must respect human dignity by making the punishment equivalent to the crime and that the execution must be kept free from all maltreatment which would make the "humanity suffering in his person loathsome or abominable." Supra at 767 (emphasis omitted). In this case, the punishment, execution by lethal injection, is indeed disproportionate to the crime. It is disproportionately low.
Having written the opinion of the Court affirming the convictions and sentences on direct appeal, I cannot help but be reminded of the gruesome, hideous crime scenes resulting from Perry's handiwork. Blasting five human beings, including a child, to death with handguns and a shotgun is not an offense that should be minimized by the subsequent onset of Perry's present psychiatric difficulties. In an exercise of gross understatement, the majority deems this rampage a "senseless criminal episode." Supra at 748. I deem this "episode" loathsome and abominable, far more so than a simple administration of Haldol. The retributive value of Perry's execution would not be diminished by the fact that his competence had been previously chemically restored. "Punishment is to vindicate the law and the social order undermined by the crime." Ernest van den Haag, The Ultimate Punishment: A Defense, 99 Harvard L.Rev. 1662, 1667 (1986).
The equally laudable goal of deterring crime by potential criminals is served in this case as well. Society has the right to protect itself from those who would commit murder and seek to avoid their legitimate punishment by a subsequently contracted, or feigned, insanity. Medical restoration of sanity, where possible, is a humane goal. Executing murderers who have been restored to sanity sends a message to a potential murderer that his act will not go unpunished. Contrived or sought after mental illness will not be factored into the balance for would-be killers, and the marginal effect, even if minuscule, is a positive factor weighing against the sentence in this case being deemed excessive.

IV.
Notwithstanding my disagreement with the majority's conclusion that administration of antipsychotic drugs would violate Perry's rights under LA. CONST. art. I, §§ 5 and 20, I feel compelled to point out the limitations of the majority's holding.
The majority's finding of constitutional infirmities under LA.CONST. art. I, § 5 (the Right to Privacy) is expressly premised on the lack of any legitimate state interest in administering the antipsychotic drugs to Perry. ("Because the involuntary medication was ordered as an integral and essential part of Perry's punishment and not because of any legitimate requirement of prison security or medical interest of Perry, we conclude that the medicate-to-execute scheme infringes on Perry's constitutionally protected interests...." Supra at 757 (emphasis added). Presumably a different result would obtain if the drugs were being administered under different circumstances, such as pursuant to a finding that Perry was a danger to himself or others (satisfying La.R.S. 15:830.1(A)), and that administration of the drugs was appropriate medically and in Perry's best interest (meeting the Washington v. Harper standards for administration of antipsychotic drugs).
Similarly, the majority's finding that administration of antipsychotic drugs to Perry would violate his Art. I, Section 20 rights against cruel, unusual, or excessive punishment is premised on its conclusion that administration of the drugs for the purpose of preparing him for execution, would, itself, be part of the punishment. ("Accordingly, we conclude that ... administration of antipsychotic drugs to a prisoner against his will, pursuant to the order of a state court or other official, for the purpose of carrying out the death penalty,... forms part of the capital punishment sought to be executed by the state." Supra at 753 (emphasis added). Again, if the sanity-inducing medication were administered for other than punitive purposes (e.g., to protect Perry or others around him), the constitutional infirmities which the majority *782 finds under LA. CONST. art. I, Section 20 would not be present.
The majority's opinion makes clear its belief that the "medicate-to-execute" scheme violates several of this state's constitutional protections. This holding is legally buttressed against the majority's findings of constitutional infirmities in a scheme wherein a defendant is medicated so that he may be rendered sane for execution (i.e., the finding of constitutional infirmities is based on the "purpose" which administration of the drugs is sought to achieve). Were Perry administered the drugs for constitutionally permissible purposes, his resulting sanity would merely be a "by-product" of this treatment. That being so, I do not view the majority's opinion as prohibiting the state from seeking to carry out Perry's lawfully imposed sentence should that situation arise.
I reach this conclusion notwithstanding the majority's overbroad statement "[i]n order to modify this stay order the state must demonstrate to this court that Perry has achieved or regained his sanity and competence for execution independently of the effects or influence of antipsychotic drugs." Supra at 771 (emphasis added). This statement follows the majority's lengthy, in-depth constitutional analysis of the "medicate-to-execute" scheme, yet the majority's opinion provides no support for the stated proposition beyond that scheme. Indeed, the majority's opinion lacks any discussion whatsoever of the constitutionality of carrying out Perry's sentence if he is rendered competent through the use of antipsychotic drugs for purposes unrelated to the execution of his sentence. For these reasons, I conclude this statement simply did not contemplate the situation discussed above, viz., Perry being administered antipsychotic drugs in a constitutionally permissible manner. Accordingly, I do not believe the majority's opinion would bar execution of Perry's sentence in that situation.

V.
Finally, it is appropriate to require that if Perry has a constitutional right to refuse the drugs, and thereby presumably avoid the death sentence, he should not thereafter be permitted to take the drugs at any time. If he prefers to remain in a self-induced psychotic state, and the majority endorses that choice, he should be allowed to do so, but he should simply not be allowed to have it both ways. I find nothing in the majority opinion addressing the predictable probability that Perry will now voluntarily take the drugs and continue to do so until the state again seeks to carry out the lawfully imposed sentence. With or without the advice of counsel, Perry should not be permitted to alternatively choose sanity and insanity. This tactic places Perry above and beyond the reach of the law and is the bottom line of the majority opinion.

VI.
For these reasons and for the additional reasons assigned by Justice MARCUS in dissent, I would affirm the order of the district court in its entirety.
NOTES
[1] Prior to trial, the trial court appointed a sanity commission to determine Perry's capacity to proceed. The commission diagnosed Perry as having a long history of paranoid schizophrenia; therefore, the trial court ordered that Perry be sent to the Feliciana Forensic Facility for evaluation and treatment. Subsequently, upon motion by the state, a second sanity commission was appointed to evaluate Perry. At the second sanity hearing, all three physicians unanimously agreed that Perry was mentally competent and could assist counsel in his defense. The trial court agreed and ruled accordingly.
[2] State v. Perry, 502 So.2d 543 (La.1986).
[3] Specifically, Perry was given Haldol to control the symptoms of his schizo-affective disorder.
[4] State v. Perry, 543 So.2d 487, reh'g denied, 545 So.2d 1049 (La.1989).
[5] 494 U.S. 1015, 110 S.Ct. 1317, 108 L.Ed.2d 492 (1990).
[6] Perry v. Louisiana, 498 U.S. 38, 111 S.Ct. 449, 112 L.Ed.2d 338 (1990) (per curiam), reh'g denied, ___ U.S. ___, 111 S.Ct. 804, 112 L.Ed.2d 865 (1991).
[7] 584 So.2d 1145 (La.1991).
[8] La.Code Cr.Pro. art. 930.3 provides:

If the petitioner is in custody after sentence for conviction for an offense, relief shall be granted only on the following grounds:
(1) The conviction was obtained in violation of the constitution of the United States or the state of Louisiana;
(2) The court exceeded its jurisdiction;
(3) The conviction or sentence subjected him to double jeopardy;
(4) The limitations on the institution of prosecution has expired;
(5) The statute creating the offense for which he was convicted and sentenced is unconstitutional; or
(6) The conviction or sentence constitute the ex post facto application of law in violation of the constitution of the United States or the state of Louisiana.
[9] The trial court, noting that there were no express statutory rules of procedure to determine competency for execution, used the procedure outlined in La.Code Crim.P. art. 641 et seq. We note that this procedure satisfies the procedural due process requirements outlined in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), namely:

1) Inclusion of the defendant in the truth seeking process;
2) The opportunity to cross examine in an adversarial setting; and
3) Inclusion of the judiciary in the decision making process (either in an active capacity or a reviewing capacity).
A specific statutory rule of procedure to determine competency for execution addresses itself to the legislature.
[10] In Harper, the Court held that under the Due Process Clause, the state could "treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." (Emphasis added). Similarly, La.R.S. 15:830.1 provides: "Whenever a mentally ill or mentally retarded inmate refuses treatment and any staff physician, staff psychiatrist, or consulting psychiatrist of the institution certifies that the treatment is necessary to prevent harm or injury to the inmate or others, such treatment will be permitted...." (Emphasis added).
[11] Perry also asserts that he is afforded a constitutionally protected right to refuse medication by a consent decree adopted by the United States District Court for the Middle District of Louisiana in Head v. King, No. 84-209-B (M.D.La. Mar. 5, 1991). First, given the evidence in the record, the scope and effect of the consent decree is unknown. Second, the proposed plan detailing the use of psychotropic medication on an involuntary basis merely follows the procedure provided in La.R.S. 15:830.1. The proposed plan does not address medication for execution and is therefore inapplicable to this case.
[12] Additionally, Perry argues that by forcibly medicating him solely for the purpose of carrying out execution makes that medication a part of his punishment not authorized by the legislature. The commission recommended that Perry be treated with psychotropic medication to control his mental disorder. He was voluntarily administered the medication prior to his sanity hearings. Additionally, his attorney authorized the state prison authorities to resume treatment of Perry with psychotropic medication after the sanity hearing of April 20, 1988. Since the medication actually benefits Perry, it cannot be viewed as a form of punishment.
[13] The trial court, noting there was no express statutory procedure to determine whether one should be forcefully medicated for purposes of execution, adopted the procedure outlined in La.Code Crim.P. art. 641 et seq. (as it did for the competency determination. See supra note 10). A specific statutory rule of procedure to permit forced medication for execution addresses itself to the legislature.
[1] It is interesting to note the majority's effort to ensure this case is decided solely on state law grounds, thus barring further, perhaps unfavorable, review by the Supreme Court of the United States.
[2] "According to polls more than eighty percent of Americans favor the death penalty." Ernest van den Haag, Why Capital Punishment?, 54 Albany L.Rev. 501, 501 (1990).
[3] The majority opinion asserts that there is no question that Perry is incurably insane and incompetent for execution but also concedes that, while medicated, Perry is able to function at a minimum level of rationality. At such a level of rationality, Perry can understand the nature of the punishment to be imposed and the reasons for its imposition. That is sufficient to pass constitutional muster.